UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) |
| v. | ) CRIMINAL NO. ) 04-10274 − PBS |
| **TONY DIAZ** | ) ) ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS**

The defendant, identified in the case caption as "Tony Diaz" ("Diaz"), moved to suppress evidence obtained as the result of a search of an automobile he was driving when he was stopped by Lawrence police on July 14, 2004. On March 28, 2005, there was an evidentiary hearing on the motion. Diaz submits this memorandum in support of his motion.

**STATEMENT OF RELEVANT FACTS**

When he was stopped in Lawrence on Farnham Street near its junction with Philips Street, Diaz was driving a blue BMW with Massachusetts registration number "3703ZE." The Lawrence police officers (Nigosian and Carabello) who stopped Diaz had only the information that had been transmitted through radio dispatch. Most of this information initiated from central dispatch, but some of it came from individual units calling into dispatch. From central dispatch to individual police units was information, first, that "victims" at the police station claimed that a person driving a blue BMW fired shots in the vicinity of the LA Grill; second, that the alleged shooter lived by the White Hen Pantry on Haverhill Street; third, that the vehicle was a 2001 BMW 530i, Massachusetts Registration −

1

3703ZE, registered to Jose Rivera, who had two addresses: 525 Essex Street and 22 Crescent Street; fourth, that the victim said there were seven shots fired; and fifth, that the shooter was drunk at the LA Grill and that he went to his vehicle and started shooting. In addition, from unidentified officers to dispatch after the identification of a blue BMW and shootings in the vicinity of the LA Grill, were reports, one, that "no one came over the bridge;" and, two, that there was "nothing in the [LA Grill] lot."

At the station, Lawrence detectives Burokas and Carroll interviewed two alleged victims, Edison and Henry Gonzalez, who claimed that the shooter had a beef with their brother over a woman some time ago and that he lived in the area of the White Hen Pantry on Haverhill Street. Although the victims appeared to claim that they could identify the shooter, there was no description of the shooter given. More importantly, there was no corroboration from any source, prior to Diaz's arrest, that there was in fact a shooting. Indeed, what was broadcast from dispatch concerning the incident, independent of the statements of the alleged victims, was that no blue BMW came over the bridge and that there was "nothing in the lot." These facts tended to negate rather than confirm the reported incident.

Officers Burokas and Carroll went with one of the victims to the area where the shooter was reported to live. This area was across town from where Diaz was stopped. Officers Burokas and Carroll did not arrive at the scene of the search until some time after Diaz had been secured outside his car.

Diaz's car was stopped because officer Nigosian spotted the blue BMW with the Massachusetts registration that had been transmitted through dispatch. Diaz pulled over when so instructed and offered no resistance. The officers effectuating the stop did so on the subjective basis of a felony

*Terry* stop and the police "Incident Report" (Exhibit A, page 2) reflects a corresponding "protective sweep" with the "suspect" being arrested only after the sweep and the subsequent identification by the victim who was in the back seat of the vehicle of Officers Burokas and Carroll.  Diaz was already cuffed and "secured" when the weapon was discovered under the passenger seat of the vehicle.

      There was testimony, principally by Officer Carabello, that the weapon found in the car that Diaz was driving was not discovered during a "protective sweep" of the vehicle's front interior as reflected in the Incident Report, but was wholly exposed and in Officer Carabello's "plain view" on the front floor of the passenger side of the vehicle as he approached that side and looked through the window.   If the court were to credit this testimony, the principal legal issues addressed in this memorandum are mooted. Accordingly, this memorandum will proceed initially as if the weapon was not in "plain view" but rather was discovered under the passenger's seat in the course of a "protective sweep" type search of the area of the vehicle that Diaz, the suspect, had vacated when he was stopped.[1]

**ARGUMENT**

I.    **A PROTECTIVE SWEEP "SEARCH" OF A VEHICLE SUBJECT TO A *TERRY* STOP IS CONSTITUTIONALLY IMPERMISSIBLE AFTER THE VEHICLE'S OCCUPANTS ARE HANDCUFFED AND/OR OTHERWISE SECURED**

      The defendant concedes that there were sufficient grounds to stop him under *Terry v. Ohio*, 392 U.S. 1 (1968).  The defendant also concedes that under *Michigan v. Long*, 463 U.S.1032 (1983) a police officer is authorized "to protect himself by conducting a *Terry*-type search of the passenger

---

[1] Diaz will deal briefly at the end of this memorandum with the "plain view" testimony.

compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle." *Id.*, at 1037.  Diaz submits, however, that if a vehicle's sole occupant is cuffed and secured, thus assuring the officers' protection, a subsequent "protective sweep" of the vehicle is unnecessary and impermissible.  Although this submission conflicts with *Michigan v. Long*, *supra*, at 1051-52,[2] which authorized a Terry-type search of an automobile even though the suspect, Long, was in police control, though not handcuffed, at the time of the search, this aspect of *Michigan v. Long* must be reconsidered in light of *Thornton v. United States*, 124 S.Ct. 2127 (2004).[3]

In *New York v. Belton,* 453 U.S. 454 (1981), the Supreme Court had authorized an officer's search of a vehicle as a contemporaneous incident of the occupant's lawful custodial arrest.  In *Thornton v. United States*, *supra,* the Supreme Court authorized the search of a vehicle that the defendant, Thornton, had exited *before* he was first confronted by the police.  The vehicle was searched and a handgun discovered under the driver's seat *after* Thornton had been arrested, handcuffed, and placed in the back seat of a patrol car.  Thus in *Thornton*, the Court extended the *Belton* rule to situations of police first contact with the person arrested after that person had exited from the vehicle subsequently searched.  Since the defendant Thornton was in custody and in handcuffs at the time of the search, the *Thornton* holding plainly extends to such circumstances.

---

[2]  See also, *United States v. Taylor*, 162 F.3d 12, 20 (1st Cir. 1998).
[3]  A justification set forth in *Michigan v. Long*, *supra*, for a *Terry*-type search of the vehicle of a suspect under the "control" of the police is the suggestion that if the suspect is not arrested "he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Michigan v. Long*, *supra*, at 1031. But that proves too much, because any suspect permitted to reenter his vehicle would also have access to weapons in closed containers within the vehicle.  Absent an arrest based on probable cause, there is no justification for a search of a closed container within the vehicle.

The Thornton ruling, however, is limited to searches <u>after arrests</u>. It does not cover *Terry*-type searches.

> In all relevant aspects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle. An officer may search a suspect's vehicle under *Belton* only if the suspect is arrested. See [*Knowles v. Iowa*, 525 U.S. 113 (1998)]. A custodial arrest is fluid and "[t]he danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty," [*United States v. Robinson*, 414 U.S. 218, 234-235, and n. 5 (1973)]. . . . The stress is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle. In ether case, the officer faces a highly volatile situation. It would make little sense to apply two different rules to what is, at bottom the same situation.

*Thornton v. United States*, *supra*, at 2131.

The scope of a warrantless search "must be commensurate with the rationale that excepts the search from the warrant requirement." *Cupp v. Murphy*, 412 U.S. 291, 295 (1973). In an arrest situation there is a dual purpose for the search of a vehicle the arrestee occupies − (1) to allow the officers to ensure their safety and (2) to preserve evidence. *See Thornton*, at 2132. *See also*, *United States v. Robinson*, 414 U.S. 218, 234 (1973) and *Knowles v. Iowa*, 525 U.S. 113, 116 (1998) (The two historical rationales, citing *Robinson*, for the search incident to arrest exception: "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial."). Only the first purpose is applicable in the *Terry* stop circumstance. This is particularly significant because the Opinion of the Court [4] in *Thornton* had the full support of only four Justices − Rehnquist, Kennedy, Thomas and Breyer. The concurrences of Justices

---

[4] The Opinion of the Court did not include footnote 4.

O'Connor, Scalia and Ginsberg and the dissents of Stevens and Souter all questioned, directly or indirectly, the viability of a police protection rationale in the context of handcuffed or otherwise secured suspects. Justice Scalia's concurrence, in which Justice Ginsburg joined, and with which Justice O'Connor appeared to agree,[5] rejects the police safety rationale in the context of a handcuffed and otherwise secured suspect as support for the search conducted. "[C]onducting a *Chimel* search is not the Government's right; it is an exception − justified by necessity − to a rule that would otherwise render the search unlawful. If `sensible police procedures` require that suspects be handcuffed and put in squad cars, then police should handcuff suspects, put them in squad cars, and not conduct the search." *Thornton, supra,* at 2134-2135, (Scalia concurring). Justice Scalia, rather, based his concurrence solely on the ground that the search was permissible because based on an officer's reasonable belief that evidence relevant to the crime of arrest may be found in the vehicle that the person arrested had just vacated. *Id*., at 2137.

The dissent of Justice Stevens, in which Justice Souter joined, similarly rejected officer safety as a ground for authorizing the *Thornton* search. "The only genuine justification for extending *Belton* to cover such circumstances is the interest in uncovering potentially valuable evidence. In my opinion, that goal must give way to the citizen's constitutionally protected interest in privacy." *Thornton, supra,* at 2140, (Stevens dissenting). It would thus appear that a majority of the Justices would not authorize a search of the vehicle of a suspect who is out of the vehicle,

---

[5] In his short concurrence, Justice O'Connor stated: "While the approach Justice Scalia proposes appears to be built on firmer ground, I am reluctant to adopt it in the context of a case in which neither the Government nor the petitioner has had a chance to speak to its merit" *Thornton, supra*, at 2133 (O'Connor concurring).

secured in handcuffs, and no longer a threat to the police when the only ground is to secure the officers' safety.[6]

In this case, there was no arrest until after the search and the results of the search, as well as a subsequent identification, supported the actual arrest. The search was, therefore, not incident to an arrest. Thornton does not directly apply. In any event, Diaz who was already cuffed and secured, was no threat to the police when the search occurred.[7]

## II. THERE WAS NO PROBABLE CAUSE TO ARREST DIAZ UNTIL AFTER HIS VEHICLE WAS SEARCHED

The government suggests that there was both probable cause to arrest Diaz and to search his vehicle before the "protective sweep" search was conducted. Although there may be circumstances where there could be probable cause for an arrest but not probable cause for a search or *vice versa*, this is not one of them.

The only support for the arrest or the search are the statements of two identified but otherwise unknown victim-witnesses. There was absolutely no corroboration that the incident reported by the "witnesses" actually took place. As already noted, the only reports through dispatch tended to negate rather than to confirm the occurrence. Given the claim that seven shots were fired in the proximity of a public establishment shortly after mid-night, one

---

[6] But see, *United States v. Osife*, 398 F.3d 1143 (9th Cir. 2005). Although this case does not directly address questions regarding police officer safety purposes, the Ninth Circuit holds that a *Thornton* type search incident to an arrest is permissible even without any police expectation of discovering relevant evidence or weapons.

[7] Citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980), the government suggests that if probable cause to arrest exists prior to a challenged search and a formal arrest promptly follows, the order is immaterial and the search is incident to an arrest. In *Rawlings,* however, there was no evidence of a subjective belief that there was only justification for a *Terry* stop prior to the search and there was plainly probable cause for the arrest prior to the search. The *Rawlings* court, in fact, specifically notes that "[t]he fruits of the search of the petitioner's person were, of course, not necessary to support probable cause to arrest petitioner." *Id.*, n. 6.

would expect the existence of some confirming reports.  Furthermore, Diaz was stopped and removed from his vehicle without incident.  There was no attempt to avoid the police or otherwise escape. There was no suspicious behavior on his part.

"Probable cause" is not a mathematical measurement.  It is determined by looking at the "totality of the circumstances" involving, in the case of a search, "a practical, common sense decision whether, given all the circumstances. . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  In the context of an arrest, probable cause exists when all the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that defendant had committed or was committing an offense.  *United States v. Pardue*, 385 F.3d 101, 107 (1st Cir. 2004).

Diaz submits that in the absence of any confirmation or corroboration of an alleged incident involving multiple gun shots in a public area and in the absence of any suspicious conduct on Diaz's part prior to the stop and the search, the mere statements of two related victim-witnesses, who are otherwise apparently unknown to the police, can not establish probable cause for either the arrest of Diaz or for the search of his vehicle.  In this connection Diaz submits that the subjective belief of the officers, who described the stop as a *Terry* stop and not as a stop supported by probable cause for an arrest, is a relevant consideration in determining probable cause. It reflects what was thought at the time on the basis of information in hand at

that time.[8]

III  **THE COURT SHOULD NOT CREDIT THE HEARING TESTIMONY THAT THE WEAPON RECOVERED FROM DIAZ'S VEHICLE WAS OBSERVED IN "PLAIN VIEW" BY OFFICER CARABELLO**

At the evidentiary hearing, one of the officers engaged in the stop of Diaz, Officer Carabello, testified that he observed weapon recovered in plain view and fully revealed on the floor of the passenger side of the vehicle as he approached the vehicle. Contradicting the plain language of the Incident Report, Exhibit A, page 2, that Detective Carroll prepared after discussions with all persons involved, Carabello testified that there was no protective sweep before the discovery of the weapon and that the weapon was not under the passenger's seat but fully exposed on the floor in front of the seat. This testimony was contradicted in part by Detective Burokas who testified that when he saw the weapon, only a portion of its handle protruded from under the seat. But Detective Burokas had also testified that he was across town when Diaz's vehicle was located and that he arrived sometime after Diaz had been removed from the vehicle and handcuffed. As Diaz's counsel recalls, Barukos could not recall whether when he first saw the weapon in the car, the door was already opened.

Detective Carroll attempted to corroborate Officer Carabello. He, remarkably, testified that Officer Carabello told him, before Carroll wrote his Incident Report, that he observed the weapon in "plain view." Detective Carroll is an experienced police officer. He plainly knows the significance of a "plain view" sighting of contraband and the meaning of a "protective

---

[8] Diaz acknowledges that the Supreme Court has recognized that an officer's subjective belief is not dispositive of the existence *vel non* of probable cause. *Florida v. Royer*, 460 U.S. 491, 507 (1983). See also, *United States v. Pardue*, 385 F.3d 101, 106, n. 2. (1st Cir. 2004).

sweep." It is inconceivable that his official report, Exhibit A, page 2, would describe Officer Caraballo's activities as "a protective sweep" uncovering "under the passenger's front seat" a loaded 45 caliber handgun, when Officer Caraballo reported to him a "plain view" sighting of the weapon fully exposed on the front floor of the vehicle and not under the passenger's seat. The court should not credit this testimony. There was no plain view sighting.

      For the foregoing reasons, Diaz's motion to suppress should be allowed.

By his attorney,

s/ Michael J. Liston

_____
Michael J. Liston BBO#301760
2 Park Plaza, Suite 610
Boston, MA  02116
(617) 426-2281

Dated:  April 4, 2005