UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 04-10274-PBS |
| TONY DIAZ, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

April 29, 2005

Saris, U.S.D.J.

**I. INTRODUCTION**

Defendant, charged with unlawful possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 922(g)(5)(A), moves to suppress items found during a search of an automobile he was driving when he was stopped by the Lawrence police on July 14, 2004. He claims that the protective sweep was in violation of his constitutional rights. At the evidentiary hearing on March 28, 2005, Brian Burokas, Kevin Nigosian, Thomas Carabello and Charles Carroll of the Lawrence Police Department testified. After hearing and briefing by both parties, the motion to suppress is **DENIED**.

**II. FINDINGS OF FACT**

On July 14, 2004, brothers Edison and Henry Gonzalez were in

their car in the parking lot of the L.A. Grill in Lawrence, Massachusetts, when a man in another car shot at them.  They placed a 911 call from their cell phone to the Lawrence police reporting that they had been shot at by a drunk man in a blue BMW with license plate 3703ZE.  The brothers then drove to the police station.  As soon as they reported the shooting to the 911 operator, a call went out over dispatch reporting the shooting at the L.A. Grill, describing the shooter's car as a blue BMW, and stating that the shooter was drunk.

Detectives Brian Burokas and Charles Carroll were at the station when they heard the dispatch report that shots had been fired at the L.A. Grill.  Within minutes of hearing the report, they learned that Edison and Henry Gonzalez were at the station, and met with them in the vestibule.  Edison Gonzalez told the detectives that he could identify the shooter, although he did not know the shooter's name.  He also claimed to know where the shooter lived.  Detective Burokas, Detective Carroll and Edison Gonzalez got into an unmarked police cruiser and drove to the apartment where Gonzalez believed the shooter lived.  The shooter was not there.

As they left the apartment, heading to the shooter's girlfriend's house, they heard over the radio that a patrol officer had spotted a man driving a blue BMW matching the description provided by the victims, in South Lawrence, near

Foster and Farnum Streets. The officer was preparing to stop the vehicle. Detectives Burokas and Carroll proceeded to the scene of the stop with Edison Gonzalez in the car to identify the shooter.

Earlier, when the call came over the radio, Officer Kevin Nigosian was on duty for the Patrol Division. He was in the vicinity of the L.A. Grill, heading to the police station to drop off a prisoner. After dropping off the prisoner, Officer Nigosian spotted a blue BMW with licence plate 3703ZE in front of him. He began following the BMW and called into dispatch to report the vehicle and to request more units for back-up so that he could conduct a felony stop.

When Officer Nigosian noticed that Officers Cote and Carabello had arrived to provide back-up, he activated his lights and signaled the blue BMW to pull over. The blue BMW pulled off to the side of the road, and Officer Nigosian pulled up behind it, with Officers Carabello and Cote in separate cars behind him. As Officer Nigosian was conducting the stop, Officer Lefebvre pulled up in another cruiser on the left. Officers Cote, Nigosian, Lefebvre and Carabello exited their cars with their guns drawn. Officer Lefebvre ordered the driver of the vehicle to exit the vehicle with his hands up, and to walk to the rear of the vehicle. When he did so, two officers conducted a pat down of the defendant and put handcuffs on him.

After the defendant was handcuffed, Officer Carabello approached the passenger side door of the BMW. He opened the door, leaned into the car, saw the handle of a gun sticking out from under the seat, and alerted the other officers that he had found a gun.[1]

As Officer Carabello was checking the car, Detectives Burokas and Carroll pulled up with Edison Gonzalez. Their car was the third or fourth car back, but the defendant was in their line of sight. From the backseat of Detective Carroll's car, Edison Gonzalez identified the defendant, who was standing handcuffed on the sidewalk. Detective Burokas, responding to Officer Carabello's announcement that he had found a gun, approached the defendant's car and removed a 45 caliber weapon from under the front passenger seat.

After Edison Gonzalez identified the defendant as the shooter and the gun was found in the car, the defendant was formally arrested and taken into custody.

---

[1] Officer Carabello remembered that he saw the gun through the window in plain view on the floorboard of the car. I don't find this testimony credible because it is inconsistent with the other evidence in the case. The police report indicates that the gun was found under the front seat during a protective sweep of the vehicle, and Detective Burokas testified that Officer Carabello was leaning into the car when he announced that he had found a gun. When Detective Burokas approached the car to remove the gun, the car door was already open and he saw only the butt of the gun exposed, as it was under the seat.

### III. DISCUSSION

The defendant wisely concedes that there were sufficient grounds for the police to conduct a Terry stop of his car. An investigatory stop is justified at its inception if "police officers have a reasonable suspicion of wrongdoing - a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime." United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Woodrum, 202 F.3d 1, 6-7 (1st Cir. 2000)). When Officer Nigosian initiated the stop, he had specific, articulable reasons for believing that the defendant was connected to the shooting at the L.A. Grill: the defendant was driving a car that matched the make, model and license plate number of the car that two eye-witnesses alleged the shooter had been driving.

The defendant also does not contest that the police had a right to handcuff him. "Police officers engaged in an otherwise lawful stop must be permitted to take measures - including the use of handcuffs - they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998).

Defendant does argue, however, that once he was cuffed and secured, the officers' safety was assured, and the subsequent "protective sweep" of the vehicle was impermissible. Defense

counsel cleverly seeks to navigate between the shoals of two Supreme Court cases.  In Michigan v. Long, the Court held that officers conducting a Terry stop of a vehicle based upon reasonable suspicion can "conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous", even if the suspect is already "'in the control' of the officers."  463 U.S. 1032, 1051 (1983); see also United States v. Taylor, 162 F.3d 12, 20 (1st Cir. 1998) (finding that a limited search of a vehicle for weapons was permitted during a Terry stop even though the occupants had been secured and taken to the back of the vehicle, because the officers reasonably believed that the suspect was dangerous). In neither Taylor nor Michigan was the suspect handcuffed.

In Thornton v. United States, 124 S.Ct. 2127 (2004), which involved a defendant who was secured and handcuffed in the back of a cruiser at the time of a search, the Supreme Court held that even when the police do not make contact with the defendant until he has left the vehicle, the "Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest."  Id. at 2129; see also New York v. Belton, 453 U.S. 454, 460 (1981) (holding that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that

6

arrest, search the passenger compartment of that automobile"); cf. United States v. Lawlor, No. 04-2044, 2005 WL 957718, at *4 (1st Cir. Apr. 27, 2005) (holding that a protective sweep of a home may be conducted following an arrest that occurs just outside of the home if "sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene").

    Relying on the concurrences and dissents in Thornton, counsel questions the viability of using the police protection rationale to justify a protective sweep of a car once the suspect is in handcuffs. See Thornton, 124 S.Ct. at 2133-35, 2139-40. Unless the suspect were like David Copperfield (the magician, not the character), how could he slip out of his handcuffs to lunge for a gun in the passenger area when the car door was closed? But this contention misses the point. As the Supreme Court has pointed out, the duration of the use of handcuffs during a detention after a Terry stop must be reasonable. Muehler v. Mena, 125 S.Ct. 1465, 1471 (2005) (holding that officers acted reasonably in detaining occupant in handcuffs for 2-3 hours while search was in progress given fact that warrant sought weapons and evidence of gang membership); Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004) (finding that plaintiff's constitutional rights were not violated by a Terry stop during which plaintiff was

handcuffed while the officers conducted a protective sweep of his car, because the officers had information that led them to believe that the suspect was currently armed and that a crime involving violence might soon occur).

Under the Fourth Amendment, police may reasonably conduct a protective sweep after putting a suspect in handcuffs during a Terry stop so that the suspect may be released from handcuffs as soon as police safety is assured.  Thus, the caselaw that permits a protective sweep even when the defendant is inescapably in police control has not been undermined by Thornton.  See Michigan v. Long, 463 U.S. at 1051-52.  Because the protective sweep was lawful, the Court need not resolve the closer question of whether there was probable cause to arrest prior to the identification by the victim.

## IV. ORDER

The motion to suppress is **DENIED**.

    **S/PATTI B. SARIS**
PATTI B. SARIS
United States District Judge