# EXHIBIT 26

1

2

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

4   UNITED STATES OF AMERICA              )
                                         )
5                                        )
    vs.                                  )   CR No. 04-10274-PBS
6                                        )
                                         )
7   TONY DIAZ                            )

8

BEFORE:  The Honorable Patti B. Saris

9

10                 HEARING ON MOTION TO SUPPRESS

11

APPEARANCES:

12

13   OFFICE OF THE UNITED STATES ATTORNEY (By: Paul R. Moore,
     AUSA), One Courthouse Way, Boston, Massachusetts 02210.
     On Behalf of the Government.

14

15   Michael J. Liston, Esq.), Two Park Plaza, Suite 610,
     Boston, Massachusetts 02116.  On Behalf of the Defendant.

16   INTERPRETER:  Deborah Huacuja

17

18        John Joseph Moakley United States Courthouse
                    Courtroom No. 19
                    One Courthouse Way
19                  Boston, MA 02210
                 Monday, March 28, 2005
20                     3:09 P.M.

21

22            Cheryl Dahlstrom, RPR, RMR
                 Official Court Reporter
23   John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3209
24                 Boston, MA 02210
         Mechanical Steno - Transcript by Computer

25

1                              I N D E X

2      Testimony of:              Direct   Cross   Redirect   Recross

3      BRIAN BUROKAS
         by Mr. Moore              5                  34
4        by Mr. Liston                     18                    37

5      KEVIN NIGOHISIAN
         by Mr. Moore             38
6        by Mr. Liston                     47

7      THOMAS CARABALLO
         by Mr. Moore             60
8        by Mr. Liston                     66

9      CHARLES CARROLL
         by Mr. Moore             75
10       by Mr. Liston                     83

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

PROCEEDINGS

1

2      THE CLERK:  Case of United States vs. Tony Diaz,

3   Criminal Action No. 04-10274, will now be heard before this

4   Court.  Will counsel and the interpreter please identify

5   themselves for the record.

6      MR. MOORE:  Good afternoon, your Honor.  Paul Moore

7   for the United States.

8      THE INTERPRETER:  Deborah Huacuja, Spanish

9   interpreter.

10      MR. LISTON:  Michael J. Liston for the defendant.

11      THE COURT:  So we have a motion to suppress here.  How

12   many witnesses?

13      MR. MOORE:  Your Honor, the government intends to call

14   four witnesses.

15      THE COURT:  All right.

16      MR. MOORE:  Are you ready?

17      THE COURT:  Yes.  Let me ask this -- I have this vague

18   memory, as I was reading these cases, that last week the

19   Supreme Court issued an opinion --

20      MR. LISTON:  If they did I missed it.

21      THE COURT:  -- about handcuffing somebody during a

22   search for protective reasons and whether or not that

23   invalidated the search.  Does that ring a bell for anyone?

24      MR. LISTON:  Not in the last week, your Honor.

25      THE COURT:  Literally, one of the more recent ones.

4

1    As I was reading it upstairs -- I had thought maybe --

2         MR. LISTON:  I did do a search about two weeks ago,

3    two or three weeks ago, your Honor, and I'm not sure I covered

4    the ground.  But I did a Thornton and then stop and frisk,

5    Terry stop, type of search.  I did not come up with a -- I was

6    looking for a case post-Thornton in the context of a Terry

7    stop.

8         THE COURT:  Let me just say, I believe that there was

9    a recent Supreme Court case, not in the context of cars but in

10   the context of a search of a home and the rights of police

11   officers to handcuff a nonsuspect, if you will, for protective

12   reasons during the course of the search.  And I seem to

13   remember reading it in my very -- I could just have been

14   reading the New York Times.  It could have been one of those

15   blurps that comes over the computer.  I wanted to flag it for

16   all of you because I just read the stuff before I walked in

17   here so I know what the case is about.  I just thought I'd

18   mention to you that something came out within the last week or

19   two.

20        MR. MOORE:  Thank you, your Honor.

21        MR. LISTON:  I don't believe the substance of the

22   defendant's position here now is that he's complaining about

23   being handcuffed so much.

24        THE COURT:  I didn't know how it would evolve, but I

25   just --

1    MR. LISTON:  Thank you, your Honor.

2    THE COURT:  Call your first witness.

3    MR. MOORE:  Thank you, your Honor.  The government

4  would call as its first witness Detective Brian Burokas.

5    Your Honor, does the Court have a preference as to

6  where I stand?

7  (Interpreter sworn.)

8    BRIAN BUROKAS, Sworn

9    THE CLERK:  Would you please be seated.  Would you

10  please state your name and spell it for the Court.

11    THE WITNESS:  May it please the Court, my name is

12  Brian Burokas.  That's B-U-R-O-K-A-S.

13  DIRECT EXAMINATION BY MR. MOORE:

14  Q.    Good afternoon.

15  A.    Good afternoon, Counselor.

16  Q.    If you would, Detective, please bear in mind that there is

17  an interpreter in this case and try and speak slowly.  If I'm

18  speaking too fast, please tell me, too.

19    What do you do for a living?

20  A.    I'm a police detective, assigned to Lawrence Police.  I've

21  been a police officer -- appointed in 1980, permanent in 1985.

22  I've been a detective since May of 1986.

23  Q.    If you would, briefly describe your training.

24    THE COURT:  Could you pull in the mic.  It's a big

25  courtroom and everyone needs to hear.  Even further -- you can

 1    adjust it.  You can move the mic, too.  It adjusts upwards.

 2    Why don't you try your full name again so we can catch it.

 3         THE WITNESS:  Brian Burokas, B-U-R-O-K-A-S.

 4         THE COURT:  Is that better for everybody?  Okay.  Go

 5    ahead.

 6    Q.   Going back over the questions, what do you do for a

 7    living?

 8    A.   I'm a police officer, Lawrence Police, approximately 26

 9    years.

10    Q.   All right.  Briefly describe your training.

11    A.   I've attended the Mass. Police Academy.  I've been to

12    three, 40-hour drug seminars; homicide trained; rape

13    investigator trained; fire investigator.  Been a detective

14    since May of 1986.  I've been qualified as an expert in

15    testimony of drug distribution in federal courts, Concord, as

16    well as Massachusetts.  Qualified as an expert in Superior

17    Court, Essex County.

18    Q.   On July 14, 2004, at about 12:30 a.m., where were you?

19    A.   I was inside the police station up in the Detectives at

20    the time.

21    Q.   Did someone come into the station reporting that a

22    shooting had just occurred?

23    A.   Yes.  It came over dispatch.  Dispatch sent a line of cars

24    down to LAW Grille and called for detectives.  And as that was

25    coming in, they said the victims were outside in front of the

7

1   station.

2   Q.   Did they come into the station?

3   A.   Yes, they did.  We talked to them right in the front

4   vestibule, myself and Sergeant Carroll.

5   Q.   Do you recall -- when you say "victims," you mean the

6   intended victims --

7   A.   Yes.

8   Q.   -- of the shooting?

9   A.   Yes.

10  Q.   Do you recall their names?

11  A.   Edison and Henry Gonzalez.

12  Q.   Did you speak with both of them?

13  A.   Yes, basically Edison.

14  Q.   Was Edison speaking Spanish or English?

15  A.   He spoke English.  It was broken but we could understand

16  him.

17  Q.   Do you speak some Spanish?

18  A.   I took two years of Castilian Spanish in high school, two

19  semesters in college.  I used it quite a bit in the early '80s,

20  but now we have Spanish officers and now more or less rely on

21  them.  I do understand Spanish.

22  Q.   Not an official part of your job, though?

23  A.   No.

24  Q.   In talking with Edison Gonzalez, did he tell you what had

25  just happened?

1  A.   He said he was at the LAW Grille.  A small Spanish guy in

2  a blue BMW shot at him and his brother Henry.

3  Q.   Did he -- he said a blue BMW.  Anything else about the

4  BMW?

5  A.   He said it was a fairly new one.  He said it was blue.  I

6  think he told me the model -- the series number.  I'm not quite

7  sure what series number it was.  It was one of these big BMW's.

8  Q.   Did he say where at the LAW Grille this happened?

9  A.   In the parking lot at the LAW Grille.

10  Q.   Did he say what he and his brother did when that happened?

11  A.   They jumped in the car and came right directly to the

12  police station.

13  Q.   So this had happened very recently?

14  A.   Yes.

15  Q.   Within minutes?

16        MR. LISTON:  Objection.

17  A.   Within minutes.

18        THE COURT:  Yes.  How many minutes?  Can you estimate?

19        THE WITNESS:  We were dispatched -- not even five

20  minutes, your Honor.  We were -- dispatch came in.  The shots

21  fired.  Detectives head that way.  And then within a matter of

22  just a minute or so, they said the victims were in front of the

23  police station.

24  Q.   Now, did you -- this information, did you consider it

25  urgent?

1    A.    Yes.

2    Q.    Did you notify the police about the information that had

3    just come in?

4    A.    We had told them we were out in front talking to the

5    victims.

6    Q.    I'm sorry.  Can you say it again.

7    A.    We had told dispatch that we were out in front talking to

8    the victims.  We came right down in front.  We said, We'll get

9    the victims out in front.

10   Q.    Do you understand whether or not dispatch then relayed

11   that information outside the police station?

12   A.    Dispatch was working and giving --

13        MR. LISTON:  Objection, your Honor.  I'm not sure what

14   -- he either heard dispatch or he didn't hear dispatch.

15        THE WITNESS:  My radio was on, Counselor.  I heard

16   dispatch.

17        MR. MOORE:  Your Honor, maybe I could --

18   Q.    Were there tapes made of the dispatch?

19   A.    Yes, there was.

20   Q.    And have you listened to that tape?

21   A.    Yes.

22        MR. MOORE:  Your Honor, counsel's been provided with a

23   tape of the 911 calls and the dispatch communications, as well

24   as with the officers' communications that actually came upon

25   the defendant.  We can play that for your Honor.

10

1          THE COURT:  Do you have a transcript?

2          MR. MOORE:  We don't have -- I'm sorry.

3          MR. LISTON:  I'm prepared basically to -- I have a

4   transcript that Mr. Moore has given me.  It does not transcribe

5   some Spanish speaking.  I don't think this is going to be an

6   issue.  I am concerned about the timing.  There's no indication

7   of when the calls came in and when they went out and what any

8   particular officer heard.  But I'm willing to accept what we do

9   have, that this is authentic and this does as good a job as

10  possible.

11         THE COURT:  Why don't we mark it rather than take the

12  time --

13         THE INTERPRETER:  I'm sorry, your Honor?

14         THE COURT:  We're going to mark it as an exhibit.

15         MR. MOORE:  Yes, your Honor.  One of the things that's

16  referenced in that sheet, there is -- the reason I hadn't

17  planned to submit the transcript to the Court as an exhibit was

18  there's not a translation of the Spanish that occurred.  The

19  second 911 call ends up being done in Spanish.  And the person

20  who received it at the police station spoke fluent Spanish.

21  But that's the call in which the license plate of the car that

22  the government says the defendant was driving was relayed to

23  the police which was then dispatched.

24         MR. LISTON:  I do not contest that during the

25  Spanish-speaking portion of the tape that I received somebody

1    on the phone gave the license number and that --

2           THE COURT:  Then I'm missing what the dispute is here.

3    Why don't we continue with the examination.

4           MR. MOORE:  Thank you, your Honor.

5    Q.   At this point in time, did you take Edison Gonzalez and

6    get in an unmarked -- what did you do at this point with Mr.

7    Gonzalez?

8    A.   Mr. Gonzalez told us he knew where the gentleman was that

9    shot at him, where he lived.  We proceeded to put him in an

10   unmarked car, and he directed us to the area of the White Hen

11   Pantry, somewhere off of Haverhill Street.  I think it was

12   somewhere up around Congress Street, one of the side streets up

13   there.  He showed us a house where he used to live.  Over a

14   garage was a white house.

15   Q.   The purpose of going in that direction, what was it?

16   A.   Just to see if he was there.  He didn't --

17          THE COURT:  I'm losing you in the pronouns.  Who told

18   you to go to the White Hen Pantry?

19          THE WITNESS:  He directed us that way.  Mr. Edison

20   Gonzalez directed us to go towards the White Hen Pantry.

21          THE COURT:  Because that's where --

22          THE WITNESS:  That's where the shooter lived or used

23   to live.

24          MR. LISTON:  Alleged shooter, your Honor.

25          THE COURT:  Yes.

1   Q.   So you're basically trying to pick up on the trail of the

2   person --

3   A.   Right.  We're trying to locate where he -- he's either

4   going back home or going someplace.

5   Q.   Mr. Gonzalez says, I think he lives here, and so you drive

6   to that area?

7   A.   Yes.

8   Q.   Did you see him there?

9   A.   No.  The apartment was empty.

10  Q.   When I say "him," I mean the person in the blue BMW.

11  A.   The apartment was empty.

12  Q.   So what happened then?

13  A.   We proceeded back.  We were headed back towards the

14  Hancock Projects.  By this time a plate had been given out.

15  Q.   Let me stop you there.  Are you listening to the radio --

16  A.   Yes.

17  Q.   -- dispatch?

18  A.   Yes.  They're giving out the plate -- description of the

19  car and the plate number.

20  Q.   Okay.  And so you're looking for the car still?

21  A.   We're looking for the car.  They also told us, from a

22  previous incident, he was involved in some machete incident.

23          THE COURT:  Hold on.  Who's the "they"?

24          THE WITNESS:  The defendant right there, sitting, with

25  the dungaree jacket.

1    THE COURT:  Be careful.  I'm losing you in the

2    pronouns.  They told me.  Is that "they," dispatch, or "they,"

3    the Gonzalezes?

4    THE WITNESS:  One of the police officers stated that

5    they had an incident involving this BMW on Crescent Street

6    where the alleged shooter had a machete at one time, and he was

7    wielding a machete at somebody.

8    Q.    So if I understand right, that's just another officer --

9    A.    Another officer telling us that he had dealings with this

10    car, this BMW, with the plate number.

11    Q.    At some other time?

12    A.    Yes.

13    Q.    And so you're listening to this radio traffic, and you're

14    still looking for the BMW?

15    A.    Yes, sir.

16    Q.    What happened next?  Did you hear something on the radio?

17    A.    Yes, sir.

18    Q.    What did you hear?

19    A.    Officer Nigohisian, who was in South Lawrence, the

20    southern part of the city, called to say that he spotted the

21    license plate and he had the car in front of him.

22    Q.    Did he say exactly where he was located at that time?

23    A.    He was somewhere off of -- if I remember distinctly, he

24    was somewhere in the Foster Street, Farnum Street area, South

25    Lawrence, off of one of the main drags.  I'm not exactly sure

14

1    which street it was.

2    Q.    Did you then head in your unmarked cruiser to that --

3    A.    We proceeded to that area.  As he was calling off the

4    streets and his direction of travel, we proceeded right to that

5    area.

6           MR. MOORE:  If I may, your Honor, at this point I'm

7    going to jump around with this witness' testimony.  Another

8    witness is going to testify about the actual pulling over of

9    the defendant.

10   Q.    So you arrived at the scene.  And what were -- you're

11   still in your car.  Was Mr. Gonzalez in the car still?

12   A.    Yes.  He was in the back seat of us.  Sergeant Carroll was

13   driving.  I was on the passenger side and Gonzalez was in the

14   back seat.

15   Q.    And the blue BMW has been pulled over, right?

16   A.    It was pulled over on -- I believe it was Farnum Street,

17   near Philips.

18           THE INTERPRETER:  Excuse me?

19           THE WITNESS:  Farnum, near Philips, I believe.

20   Q.    And so at this point were you looking for Mr. Gonzalez to

21   identify whether or not the person who had been pulled over was

22   the shooter?

23   A.    That was our reason for going to there; to see if that

24   was, indeed, the car; indeed, the alleged shooter.

25   Q.    All right.  Did he do that at that time?

1    A.    Yes, he did.

2    Q.    Was there anyone else present that came out of the car

3    that you could see?

4    A.    He was the only person out of the car.  He was the only

5    person in the car.  He was the only one that was brought out of

6    the car.

7    Q.    When you say "him," you're talking about the alleged

8    shooter?

9    A.    Yes.

10   Q.    Let me just -- you're pointing at the table here.  Do you

11   see the person that Mr. Gonzalez identified that night?

12   A.    The one sitting in the middle, with the

13   salt-and-pepper-colored hair, with the dungaree jacket.

14          MR. MOORE:  Your Honor, may the record reflect that

15   the witness has identified the defendant as the person that was

16   identified by Mr. Gonzalez that night?

17          THE COURT:  Certainly, the one in the dungaree jacket.

18   I don't know if I'd say salt and pepper, but I'm willing to go

19   with the dungaree jacket.

20          MR. MOORE:  Thank you, your Honor.

21   Q.    Did you or any other officer communicate that Mr. Gonzalez

22   had then identified the person -- the defendant as the shooter?

23   A.    We had put it on the radio that we had -- that it was a

24   positive, and I got out of the car.  I said, That's him.

25   Q.    Okay.  So the other officers at the scene you made

1    aware --

2    A.    Yes.

3    Q.    -- with this identification?

4    A.    Yes.

5    Q.    Now, let me ask -- I'm jumping around again.  But, to your

6    knowledge, did another officer see a gun in the car?

7    A.    Yes.

8              MR. LISTON:  Objection, your Honor.  Foundation.

9              THE COURT:  Well, lay the foundation for it.

10             MR. MOORE:  All right.

11             THE COURT:  Were you there?

12   Q.    Were you there?

13   A.    We were there.  We pulled up --

14   Q.    Was there an officer named Thomas Caraballo there?

15   A.    Yes.

16   Q.    Did you see him?

17   A.    Yes.  He was on the passenger side of the BMW.  He was

18   leaning into the car.  Within a matter of seconds, popped his

19   head out and said, "I got a gun."

20   Q.    Okay.  What happened then?

21   A.    I proceeded over.  I had gloves on.  I removed the gun

22   from -- it was right sticking out from under the passenger side

23   of the seat.  The butt was exposed to me.  I pulled it out,

24   cleared it to make sure it was safe, dropped the clip.  There

25   were three rounds in the clip.

1    Q.    I'm sorry.  Did you say put three rounds in the clip?

2    A.    There was three rounds in the clip.  I put them in a paper

3    bag and proceeded to log it into evidence.

4    Q.    All right.  Is that the gun that's identified in the

5    indictment in this case?

6    A.    Yes.  It's a Para Ordnance model.

7    Q.    Is that a .45-caliber handgun?

8    A.    Yes, sir.

9    Q.    Now, you mentioned that you speak some Spanish.

10   A.    Yes.

11   Q.    Were you present later that evening when the defendant was

12   brought in for booking?

13   A.    Yes, I was.

14   Q.    Was there another officer who speaks Spanish that was

15   speaking to the defendant?

16   A.    Officer Marco Aiella.

17         MR. MOORE:  I'll note for the Court that's another

18   witness that the Court will be hearing from.

19   Q.    Did you hear Officer Aiella advise the defendant of his

20   Miranda rights?

21   A.    Yes, I did.

22   Q.    Was there a -- after that point did you hear -- I'm not

23   asking what the statements were.  Did you hear if the defendant

24   spoke after that?

25   A.    He understood the statements.  After each sentence, Aiella

1    asked him if he understood.  "Si" was after every sentence.

2    Then when he was done, I asked Marco Aiella to ask him in

3    Spanish if he had a license to carry the gun and where did he

4    get the gun.  He said he didn't have a license, but he said he

5    bought it off the street for $300.

6    Q.    During the limited time that you observed the defendant

7    that night, did he appear to you -- did any of his behavior

8    suggest to you that he was somehow incapacitated or not

9    understanding what was going on?

10   A.    No.  He was alert, looking at us, standing on his own, not

11   leaning on a counter.

12   Q.    All right.  Did he hesitate at all in answering the

13   questions?

14   A.    No, not at all.

15   Q.    Did he appear not to understand?

16   A.    Seemed like he was alert to me.  I mean, he looked right

17   at me when I asked the question to Aiella.  And he looked to

18   Aiella to ask him in Spanish.

19        MR. MOORE:  Your Honor, I have no further questions of

20   this witness.

21   CROSS-EXAMINATION BY MR. LISTON:

22   Q.    Detective Burokas, I believe that Assistant U.S. Attorney

23   Moore asked you about a -- when you first heard that something

24   allegedly happened, did you hear it over the dispatch?

25   A.    We heard it over the radio, "shots fired," yes, sir.

1    Q.    But you heard that from a dispatch?

2    A.    Dispatch, yes.

3    Q.    You don't know, do you, sir, what the source of the

4    information to the dispatch was?

5    A.    No.

6    Q.    And you do not know how long after the alleged shooting

7    the dispatch got the message that there was a shooting, do you?

8    A.    No, no, sir, not the exact time.

9    Q.    So you don't really know the relationship of the time that

10   you sat down and you were with Mr. -- the two Mr. Gonzalezes

11   that came into the police station, do you?

12   A.    They were there instantaneously.  As soon as the dispatch

13   came --

14        THE INTERPRETER:  I'm sorry.  I missed that.

15   Q.    They were there --

16        THE INTERPRETER:  I'm sorry.  I missed your sentence.

17   A.    They were there instantaneously.  When it was dispatched,

18   they were there within a matter of seconds.

19   Q.    What you're talking about is the timing between the

20   dispatch and when the Gonzalezes and you met?

21   A.    Just a matter of seconds, yes.

22   Q.    But you don't have any idea about the distance in time

23   between the alleged shooting and when the dispatch came out

24   and/or when the Gonzalezes came to the police station?

25   A.    We don't know exactly what time the call came into the

1   station, but it's usually -- I mean, it seemed like it -- shots

2   fired.  Cars go to LAW Grille.  Then the next thing we know the

3   victims were in front of the station.  It was almost

4   instantaneously.

5   Q.   Again, the instantaneous that you're talking about is the

6   instantaneous between the dispatch message and the time you

7   spoke with the Gonzalez brothers?

8   A.   Right.

9   Q.   You don't have any idea, do you, when the alleged shots

10  were fired?

11  A.   No.

12  Q.   No other source of information with respect to the alleged

13  shots?

14  A.   No.

15  Q.   So that there were two brothers that came in and spoke

16  with you?

17  A.   Yes.

18  Q.   Now, had you ever dealt with either of those before?

19  A.   Not to my knowledge.

20  Q.   And you're not aware that either of them is an informant

21  for the Lawrence police?

22  A.   Not to my knowledge.

23  Q.   Now -- and the information that you were given by the

24  Gonzalezes, was any of that information subsequently

25  dispatched?