1   A.   It was given out that we had Mr. Gonzalez in the car.  We
2   proceeded to a location up by White Hen.
3   Q.   Okay.  And you met with two Gonzalez brothers?  Was it
4   Henry Gonzalez and Edison Gonzalez?
5   A.   Edison got in the back of our car.  Edison was the only
6   one who got in our car.  Henry stayed at the station.
7   Q.   You were speaking with the two Gonzalez brothers?
8   A.   Yes.
9   Q.   Neither of those two Gonzalez brothers gave you a license
10  plate number, though, did he?
11  A.   Not to my knowledge, Counselor, no.
12  Q.   Edison Gonzalez was the one who got into the cruiser with
13  you?
14  A.   Yes, sir.
15  Q.   Was there anyone else in the cruiser with you besides Mr.
16  Edison Gonzalez?
17  A.   Sergeant Carroll.
18  Q.   And you and Sergeant Carroll went to locations where Mr.
19  Gonzalez told you you might find the person they claim was
20  shooting?
21  A.   Yes, sir.
22  Q.   And the location that you went to was near a White Hen?
23  A.   White Hen Pantry.  It was up on Haverhill Street, which is
24  approximately a mile and a half from the police station.
25           THE COURT:  Well, what did the Gonzalezes tell you

1  about who shot them?
2          THE WITNESS: They just said they knew the guy, but
3  they didn't know what his name was. I think -- Mr. Edison
4  says, I think I know where he lives. We said, Can you show us
5  where that was?
6          THE COURT: He says, I don't remember the name but I
7  think --
8          THE WITNESS: The name of the street. I don't
9  remember the name of the street, but I can show you where it
10 is.
11         THE COURT: Did he know the name of the person?
12         THE WITNESS: No. He said he couldn't remember the
13 name of the person. He said, I'm almost positive I know where
14 he lives, something to that effect.
15 Q.   I believe you said that he was driving a blue BMW, one of
16 the larger models?
17 A.   Yes.
18 Q.   Now, how far is this location where Haverhill Street and
19 the White Hen Pantry and Philips and Farnum Street where the
20 arrest -- the stop --
21 A.   Opposite sides of the city. It's probably -- if I go
22 Haverhill Street -- Haverhill Street to Route 28 -- Haverhill
23 Street runs into Route 28. And the side street where they were
24 was probably five, six blocks up. And then we go across the
25 city, and Farnum and Abbott Street, where the car -- when we

1  were going to the LAW Grille?  Is this --
2  Q.   No.  Let me ask you another question.  I think we'll get
3  to it.
4       I believe you testified that at some point you heard
5  Officer Nigohisian --
6  A.   Nigohisian, yes, sir.
7  Q.   And you heard this on your radio?
8  A.   Yes, sir.
9  Q.   -- indicate that he spotted the vehicle with the license
10 plate that had already been given over the dispatch?
11 A.   Yes, sir.
12 Q.   At that time where were you?
13 A.   We were headed from the Haverhill Street, Congress Street
14 location, down towards the Hancock Projects, where the alleged
15 victim thought that the guy's -- the alleged shooter's
16 girlfriend lived.  We were looking in the Hancock Projects,
17 which is a couple blocks away.  We proceeded over to South
18 Lawrence from there.
19 Q.   So that you made the trip to the other side of the city,
20 essentially, after you understood that Officer Nigohisian had
21 spotted this vehicle?
22 A.   Yes.
23 Q.   Now, when you and Sergeant Carroll arrived, was any
24 officer on location besides Officer Nigohisian and Caraballo?
25 A.   Yes, sir.

1  Q. First of all, were Nigohisian and Caraballo, were they in
2  the same car? Were they officers that were together?
3  A. No, sir. They ran single-man cars.
4  Q. So do you know which car arrived first?
5  A. Nigohisian. Well, Nigohisian was the first car.
6  Q. You know -- you only know that because somebody told you
7  that?
8  A. No. Nigohisian said that he spotted the car, so
9  Nigohisian is the first car that's there.
10 Q. When you arrived Officer Nigohisian's vehicle was parked
11 somewhere?
12 A. Behind the suspect car, yes, sir.
13 Q. And Officer Caraballo's car was parked somewhere?
14 A. Behind the suspect car.
15 Q. And were there any other police vehicles in the area?
16 A. There was quite a few, sir.
17 Q. So that would it be fair to say that you, among the police
18 officers, were one of the later to arrive?
19 A. Yes, sir.
20 Q. So that when you arrived -- let me back up again. I
21 believe you stated, though, that when you arrived you observed
22 Officer Caraballo looking in the window --
23 A. He was --
24 Q. -- of the car.
25 A. He was just approaching the passenger side of the car.

1  They had him secured. They had that gentleman there, secured.
2  Q.  He was -- when you arrived he was already out of the --
3  A.  He was out of the car. He was secured. He was brought
4  back from his vehicle.
5  Q.  He was away and he was handcuffed, wasn't he?
6  A.  I don't know if he was handcuffed. I didn't see at this
7  time.
8  Q.  You don't know. And you didn't see him being frisked or
9  anything like that?
10 A.  I saw him being patted down, yes, sir.
11 Q.  Where was he in relationship to the car?
12 A.  He was toward the rear end, left driver's side rear end.
13 Q.  He wasn't placed in one of the vehicles?
14 A.  Not when he was -- no, no. We pat them down before we
15 place them in the vehicle.
16 Q.  He wasn't placed on the ground?
17 A.  Not to my knowledge, no.
18 Q.  And you didn't see any handcuffs on him?
19 A.  Not when I arove (sic), no, not when I got there.
20 Q.  Now, I believe you testified that you saw Officer
21 Caraballo look in the side window?
22 A.  He was going to the passenger side of the car, just by the
23 front door, opening the door and just looking in.
24 Q.  At that time other officers had already arrived and the
25 defendant was already secured, as you say?

1  A.   Yes.
2  Q.   And when you say "secured," what do you mean by that?
3  A.   He was brought away from the car. He didn't have access
4  to the car.
5  Q.   And he was in some form of restraint?
6  A.   I don't know if he was restrained or not, sir. I couldn't
7  tell you.
8  Q.   What's the usual police practice under circumstances like
9  that?
10 A.   For my safety, I would cuff him. I don't know what the
11 other officers do, sir. We don't have a standard procedure.
12 Q.   But your testimony was that he was secured?
13 A.   He was secured.
14          THE COURT: At what point did the Brother Gonzalez
15 identify the defendant? Before or after Mr. Caraballo went
16 into the car?
17          THE WITNESS: Just prior -- well, we had gotten there.
18 Mr. -- the one who was in the back seat of our car, prior to
19 Caraballo getting to the passenger side of the car, he was
20 identified. He said, That's the guy and that's the car, or
21 that's the car and that's the guy. It was just as we arrived.
22 He said, "That's the car."
23 Q.   He said, "That's the car"?
24 A.   Uh-huh. Then he said, "That's the guy." He went, "That's
25 the guy."

1   Q.   Was the defendant brought to a certain location for Mr.
2   Edison Gonzalez to take a look at him?
3   A.   No.  He could see him.  When we pulled in, he was in a
4   line of sight.
5   Q.   How far away was he?
6   A.   Maybe about three cars, 45 feet.
7        MR. LISTON:  If I may have a moment, your Honor?
8   (Discussion held off the record.)
9   Q.   Was there -- when you arrived, was there somebody in
10  charge of the scene at that time?  Was there an officer in
11  charge?
12  A.   Nigohisian was the one that had made the initial stop.  It
13  was Nigohisian's stop.  Detectives usually take over the scene
14  when it's a felony like that.  So Sergeant Carroll would have
15  been the next one in charge or he would have taken charge of
16  the scene.
17  Q.   I'm going to show you what is -- appears to be an incident
18  report.
19  A.   Yes, sir.
20  Q.   Have you seen that before?
21  A.   This morning, sir.
22  Q.   First of all, do you know who authored that report?
23  A.   Sergeant Carroll.
24  Q.   Is it fair to say that if Sergeant Carroll was the author
25  he discussed what happened in there with the other officers who

1   were involved?
2   A.   Basically, yes.
3   Q.   Did he discuss it with you?
4   A.   I was there with him.
5   Q.   I'm sorry. When he did the report, when he wrote up the
6   report?
7   A.   Not when he did the report. I was there with him
8   throughout the whole scenario.
9   Q.   I wonder if you would take a moment to take a look through
10  that and tell me whether there's anything in there that you
11  know of your own knowledge, having seen it, and with your own
12  eyes, having received it, is not correct, as far as you say.
13  A.   Just that Sergeant Carroll said he had -- he placed Rivera
14  on the sidewalk for the show-up.
15  Q.   So you're saying that the reference on Page 2 that said,
16  "Sergeant Carroll had CPO" --
17  A.   That's community policing officer.
18  Q.   -- "place Rivera on the sidewalk" --
19  A.   For a show-up, yup.
20  Q.   That's not accurate?
21  A.   That's accurate.
22       It says the sweep was done by -- "protective sweep was
23  done prior to Mr. Rivera being identified."
24  Q.   Is that accurate or inaccurate?
25  A.   I don't recall that, but if that's what Sergeant Carroll

1   wrote, that's what he wrote. I remember Caraballo --
2   Q.   Is there anything in there that is inconsistent or
3   contradicts what you saw yourself?
4   A.   No, other than Sergeant Carroll doing that. That's the
5   only thing that's different, sir.
6   Q.   By that, you're referring to what?
7   A.   Sergeant Carroll had Officer LeFebvre place him on the
8   sidewalk for a show-up.
9   Q.   Before Mr. Edison Gonzalez made the identification that
10  we're talking about, he was in the back seat of the car that
11  you and Officer Carroll were driving?
12  A.   Right.
13  Q.   Did Officer Carroll get out of the car before Mr. Gonzalez
14  identified?
15  A.   He did.
16  Q.   And did you stay in the car?
17  A.   Yes, I was in the car.
18        THE COURT: Well, let me back up. I'm confused. Does
19  that refresh your recollection that the sweep of the car was
20  done --
21        THE WITNESS: The sweep of the car was done prior to
22  him being identified, your Honor, yes.
23        THE COURT: You changed your testimony. That's
24  refreshing your recollection on that, then?
25        THE WITNESS: Yes.

1      THE COURT: All right. I'm just trying to understand
2  this. Were you present when the officer went up to the
3  passenger side and said, "I see a gun"?
4      THE WITNESS: I was there.
5      THE COURT: Or did that happen before you arrived?
6      THE WITNESS: No, no, no. I was there when he said I
7  saw the gun. He did a protective sweep prior to him being
8  identified. I remember Caraballo going up to the car. I just
9  didn't recall whether Sergeant Carroll was in the car or out of
10 the car and Sergeant Carroll had the guy step to the sidewalk.
11 I know that he was identified prior -- I thought it was prior
12 to the sweep of the car, but the way it's written it was done
13 -- the sweep of the car was done and then he was identified. I
14 thought it was just the opposite way.
15     THE COURT: When you say "the sweep," you mean the
16 going into the car and looking under the seat?
17     THE WITNESS: Right. But I remember Caraballo saying
18 he had a gun. I was stepping out of the car when he said he
19 had the gun -- a gun.
20 Q.  All right. But you did tell us that Officer Carroll got
21 out of the car first.
22 A.  I didn't recall that until I read that in the report, yes,
23 sir.
24 Q.  Okay. Now you're telling us that -- who was driving the
25 car?

31

1    A.    Carroll.

2    Q.    He was driving the car. You were sitting in the passenger
3    seat and Edison Gonzalez is in the back?

4    A.    Yes.

5    Q.    You arrived in that car. There were already several cars
6    and police cars in that area?

7    A.    Yes.

8    Q.    The defendant is out of the car?

9    A.    Yes.

10    Q.    Secured somewhere behind the car?

11    A.    Yes.

12    Q.    You stay in the vehicle that Sergeant Carroll was driving,
13    at least for some time --

14    A.    Right.

15    Q.    -- after Sergeant Carroll got out of the car?

16    A.    I didn't recall him getting out of the car, but he did get
17    out of the car.

18    Q.    Was Sergeant Carroll out of the car when you say that
19    Officer Caraballo said something about there's a gun in the
20    car?

21    A.    He yelled that he had a gun. He was out of the car.

22    Q.    Sergeant Carroll was out of the car?

23    A.    Yes, sir.

24    THE COURT: So I can understand it, it was after
25    Caraballo yells he's got a gun --

Case 1:04-cr-10274-PBS   Document 54-28   Filed 05/17/2006   Page 12 of 20

32

1      THE WITNESS:  He said he had a gun.
2      THE COURT:  Had a gun.  It's after that exclamation
3  "he's got a gun" that Mr. Gonzalez identifies him, is that
4  right?
5      THE WITNESS:  Yes, yes.
6  (Discussion held off the record.)
7      THE COURT:  Can I be honest?  I can hear this.  I
8  don't speak a word of Spanish; but since there are people here
9  who do, if you want this to be confidential, you've got to
10 be --
11     MR. MOORE:  I don't speak Spanish at all.
12 (Discussion held off the record.)
13     THE COURT:  I can hear again.  Do you need time with
14 him?
15     MR. LISTON:  Perhaps two minutes, your Honor.  Could
16 we perhaps go over to a corner or something like that?
17     THE COURT:  I would suggest just -- why don't you
18 go --
19     MR. LISTON:  Where the marshals are?
20     THE COURT:  Just sit at the back table there.  Get
21 away from the mic, maybe in the back corner there.  Take a
22 quick recess.  You're the only one here, sir, who can
23 understand Spanish.  Maybe we could take a recess and you can
24 leave the stand.  He's speaking so loudly.
25     MR. LISTON:  The acoustics are too good here.

```
 1              THE COURT:  Why don't we take a two-minute recess.
 2   (Short recess taken.)
 3              MR. LISTON:  Thank you, your Honor.
 4              THE COURT:  Are you all set or do you have more
 5   questions?
 6              MR. LISTON:  A couple more questions, your Honor.
 7   Q.   Detective Burokas, did you testify in the district court
 8   at a bail hearing with respect to this incident involving the
 9   defendant?
10   A.   It's possible, Counselor.  I don't recall.
11   Q.   Do you recall testifying at the bail hearing that you
12   received the license plate number from the Gonzalez brothers as
13   opposed to from the dispatch?
14              MR. MOORE:  Objection, your Honor.  There's no
15   foundation for this information.
16              MR. LISTON:  I don't think I need foundation.  I'm
17   just asking him a question.
18              THE COURT:  Do you remember that?
19              THE WITNESS:  I don't recall.
20   Q.   When you were out in the hallway there, were the other
21   officers out there?
22   A.   Just now?
23   Q.   Yes.
24   A.   Yes.
25   Q.   Did you discuss any of your testimony with them?
```

1   A.   No, sir.

2   MR. LISTON: I have no further questions, your Honor.

3   REDIRECT EXAMINATION BY MR. MOORE:

4   Q.   Detective, if you would, describe the scene a little bit
5   that night. How many officers were there, uniformed and
6   ununiformed, any idea?
7   A.   I'd say probably the whole shift was there. 12:30 at
8   night is the end of the shift. I would say the whole shift,
9   maybe 11 officers total.
10  Q.   How many cars, any idea?
11  A.   Half a dozen, a dozen, half a dozen to maybe -- six to
12  eight, six to nine cars.
13  Q.   A lot of emergency lights going?
14  A.   Lights were going.
15  Q.   People have their spotlights illuminated?
16  A.   Everything was illuminated. The whole area was
17  illuminated.
18  Q.   I didn't hear your response earlier. Were you in charge
19  of the scene?
20  A.   Sergeant Carroll was.
21  Q.   You didn't write a report in this case?
22  A.   No, I did not.
23  Q.   Did Sergeant Carroll come to you and say, I need you to
24  review this report before I submit it?
25  A.   No.

1  Q.   Is that something that regularly would happen?
2  A.   No. The sergeants basically, pretty much, do our own
3  reports.
4  Q.   You've written your own reports, haven't you?
5  A.   Yes.
6       THE COURT: About this incident?
7       THE WITNESS: No.
8  Q.   Have you written any reports about this incident?
9  A.   No, none.
10 Q.   By the way, do you recall when the detention hearing was
11 that the defense attorney referred to?
12 A.   I don't recall.
13 Q.   Probably quite some time ago?
14 A.   I would say, yeah.
15 Q.   Have you had a few hearings since then?
16      THE COURT: I've got it.
17      MR. MOORE: Thank you, your Honor.
18 Q.   When you write a report, you do that on the basis of
19 information that other officers sometimes have provided to you?
20 A.   Basically, it's a brief synopsis of -- it's a synopsis of
21 what went on. There's probably more when you refresh your
22 memory and read the report.
23 Q.   When you say "synopsis," it's not meant to include each
24 and every fact, each and every event?
25 A.   Right.

1  Q.  Going to the timing that counsel discussed with you, the
2  first interaction you had with the Gonzalezes, you've listened
3  to the tapes and you've told the Court you've heard the
4  recordings of the first call that came in, right?
5  A.  Yes.
6  Q.  From listening to that, is it your understanding that the
7  people calling were right out in front of the police station?
8       MR. LISTON:  Objection, your Honor.  If he's asking
9  him from listening to the tape -- I don't know what he's
10 asking, whether he now recalls that they were right outside.  I
11 don't think this makes a difference.
12      MR. MOORE:  Well, it goes to the credibility of the
13 witness which counsel is trying to -- not particularly key
14 but --
15      THE COURT:  What's the question?  Let's just get
16 through this.  We have three other witnesses.
17      MR. MOORE:  Absolutely.
18 A.  Listening to the tape, the guy said he was right out in
19 front of the station.
20 Q.  And then they were there, right?
21 A.  Yes.
22 Q.  You testified they came in, the Gonzalezes?
23 A.  Yes.  They came out, detectives, shots fired, line cars,
24 shots fired at LAW Grille.
25 Q.  And so your belief is that the two people who first called

```
 1  in were --
 2          MR. LISTON:  Objection, your Honor.
 3          THE COURT:  Let's just --
 4          MR. MOORE:  All right.  That's it, your Honor.
 5          THE COURT:  Okay.
 6          MR. MOORE:  Thank you, Detective.
 7          MR. LISTON:  One question.
 8  RECROSS-EXAMINATION BY MR. LISTON:
 9  Q.   I believe you stated that there was virtually the whole
10  shift there, correct?
11  A.   Yes.
12  Q.   That's when you and the sergeant arrived?
13  A.   No, not when the whole shift was there.  We arrived
14  sometime prior to the rear end of the guys.  I mean, there was
15  cars that were parked in back of us, too.
16  Q.   There were plenty there when you arrived?
17  A.   Yes.
18  Q.   You were definitely not the first there?
19  A.   No, definitely not.
20  Q.   And you were not right after Nigohisian?
21  A.   No.
22          MR. LISTON:  Nothing further, your Honor.
23          MR. MOORE:  The government would call as its next
24  witness Officer Kevin Nigohisian.
25          KEVIN T. NIGOHISIAN, Sworn
```

Case 1:04-cr-10274-PBS    Document 54-28    Filed 05/17/2006    Page 18 of 20

38

1       THE CLERK:  Please be seated.  Would you please state
2  your name and spell it for the record.
3       THE WITNESS:  I'm Officer Kevin Thomas Nigohisian,
4  Lawrence Police Department, N-I-G-O-H-I-S-I-A-N.
5  DIRECT EXAMINATION BY MR. MOORE:
6  Q.   Good afternoon.
7  A.   Good afternoon.
8  Q.   I just want to remind you, Officer Nigohisian, that
9  there's an interpreter in this case.  I try to keep that in
10 mind.  If you would, when you're talking, try to speak slowly
11 and clearly.  And, also, if you could be careful with your use
12 of pronouns, make sure, when you're referring to specific
13 individuals, make clear who you're referring to.
14 A.   Yes, sir.
15 Q.   What do you do for a living?
16 A.   I'm a police officer with the Lawrence Police Department.
17 Q.   How long have you been doing that?
18 A.   Six years now.
19 Q.   Briefly describe your training.
20 A.   I went to the Lowell Police Academy in 1999, and I've been
21 on the job ever since.
22 Q.   On the night of July 14, 2004, at approximately 12:30
23 p.m., what were you doing?
24 A.   I was working in the Patrol Division.
25 Q.   I'm sorry?

1  A.  I was working in the Patrol Division.
2  Q.  Okay.  What does that involve?
3  A.  Answer the area calls of the Arlington District.
4  Q.  You're driving around in a car?
5  A.  Yes.
6  Q.  It's a marked police cruiser?
7  A.  Yes, sir.
8  Q.  Were you listening to radio traffic and dispatch from the
9  police station?
10 A.  Yes, sir.
11 Q.  Did you become aware of a shooting that occurred that
12 night?
13 A.  Yes, sir.  While transporting a prisoner back from a
14 separate incident, another officer arrest, we were called that
15 there had been a shooting at the LA Grille, or LAW Grille, at
16 the corner of Amesbury and Canal Street.
17       THE COURT:  What time was that?
18       THE WITNESS:  Approximately 12:30.
19       THE COURT:  Which day was that?  That was the 12:30
20 a.m.?
21       THE WITNESS:  Yes.
22 Q.  All right.  So you heard that there had been a shooting?
23 A.  Yes.
24 Q.  Was there a description of anyone involved in the shooting
25 or any vehicle involved?

1   A.   Yes.  It was a blue BMW.  I believe it was a 2001, was the
2   year they gave out.
3   Q.   Okay.  Did you have any awareness that some of the
4   intended victims had shown up at the police station?
5   A.   At that time, no, I did not.
6   Q.   Okay.  Was there -- while you're driving around, are you
7   looking for that blue BMW?
8   A.   Sir, I was almost at the location when the call came out,
9   and I noticed the vehicle wasn't there.  I contacted dispatch
10  and let them know that the vehicle did not come over the bridge
11  the direction I was traveling.
12  Q.   At some point in time, before you saw any blue BMW that
13  you recall, did the license plate of the car that was allegedly
14  involved get transmitted to you via dispatch?
15  A.   I'm sorry?
16  Q.   That's a bad question.
17  A.   I'm confused where we're going.
18  Q.   That was a horrible question.
19       At some point in time did dispatch tell you what the
20  license plate was of that blue BMW?
21  A.   I'm sorry.  I'm on the wrong partners.  You lost me.
22       At the time that the call came out, I was traveling,
23  transporting the prisoner, bringing back to the station over
24  the Central Bridge, which almost intersects with the club that
25  they were talking about, the LAW Grille.