1       At that time the vehicle that they gave out was a blue
2  BMW, approximately early 2000s, roughly. I notified dispatch
3  that I had not seen the vehicle from the direction I was
4  traveling in. I went back to the station, dropped off the
5  prisoner I had, left the station, and began searching for the
6  vehicle with the rest of the units.
7  Q.   Okay. Now, let me repeat that question. At some point in
8  time do you recall whether or not the license plate for the
9  blue BMW was told to you over your radio by dispatch?
10 A.   Yes, sir, it was.
11 Q.   Okay. At that point did you begin looking for a car that
12 was a blue BMW with that license plate?
13 A.   Yes, sir.
14 Q.   At some point in time did you see such a car?
15 A.   Yes, I did.
16 Q.   Did the license plate match what had been told to you by
17 dispatch?
18 A.   Yes, sir, I did.
19 Q.   What did you do then?
20 A.   The vehicle actually turned off Broadway, taking a left.
21 Q.   Let me stop you there. Did you tell dispatch that you saw
22 the vehicle?
23 A.   Yes.
24 Q.   Were other units able to listen to that traffic between
25 you and dispatch?

1     A.     Yes, sir.

2     Q.     Okay. So what happened next?

3     A.     The vehicle passed in front of me. I visibly saw the

4     plate, called dispatch. It was verified. I got behind the

5     vehicle, notified them of what I had, and asked for additional

6     units so we could stop the vehicle.

7     Q.     Why did you ask for additional units?

8     A.     Because at the time we were informed that this was

9     involved in a shooting at that club, so there could possibly be

10     a firearm in the vehicle and that's standard procedure.

11     Q.     So at some point in time did you pull the vehicle over?

12     A.     That's affirmative. Yes, sir.

13     Q.     Did other -- were other units on the scene at that point?

14     A.     Yes, sir.

15     Q.     Is that why you began it at that time?

16     A.     We had stopped the vehicle and began a felony stop of the

17     vehicle.

18            THE INTERPRETER: I'm sorry. Could you repeat that.

19     A.     We had stopped the vehicle and began a felony stop.

20     Q.     When you say "we," was there someone else in your vehicle?

21     A.     No, sir.

22     Q.     All right. Now, you've said "a felony stop." You've said

23     that this -- you knew there was a shooting involved. Is there

24     a different procedure you follow from a regular traffic stop

25     when something like that's alleged to have occurred?

1    A.    Yes.  Under the circumstances, with the firearm or a
2    violent felon, we do what's called a felony stop.  We take
3    people out at gunpoint, bring them to the back of the vehicle
4    to prevent --
5            THE INTERPRETER:  I'm sorry.
6            THE COURT:  You're speaking so quickly and it's --
7    when I say that, since I speak quickly, that's a bit of a
8    problem.  You need to slow down.  We're trying to learn what
9    happened.
10           THE WITNESS:  I'm sorry.
11   Q.    Let's back up a little bit.  If you would, just kind of
12   break down this felony procedure.
13           You used -- right then you said "we" pulled them out
14   of the car.  So did you go up to the car and pull him out?
15   A.    No, sir.
16   Q.    What happened?  Was there a communication to a person in
17   that vehicle and, if so, made it?
18   A.    Myself and the other officers on the scene.  We had our
19   blue lights activated.  We stopped the vehicle.  At which time
20   we all had our firearms drawn.  Some were on the left of me;
21   some were on the right of me.  One of the detectives -- I
22   believe it was Detective LeFebvre -- actually gave out the
23   command for the gentleman, Mr. Diaz.
24           THE INTERPRETER:  I'm sorry.  I cannot hear him, your
25   Honor.

1       THE COURT: Let's try and get --
2       THE INTERPRETER: If he could speak a little bit
3 louder.
4       THE COURT: Detective who, LeFebvre?
5       THE WITNESS: Detective LeFebvre.
6  Q.   Spell that, if you would.
7  A.   I believe it's L-E-F-E-B-V-R-E.
8       THE INTERPRETER: Thank you.
9  Q.   Just continue describing this procedure by which the
10 defendant exited the vehicle.
11 A.   The suspect -- the gentleman was asked to open the door,
12 show us his hands. At which time he exited the vehicle. Had
13 his hands in the air. Had him come back towards the car. I
14 believe it was either Detective Montecarvo or Detective
15 LeFebvre was able to secure his arms, take him to the rear of
16 the vehicle, pat him down real quickly to be sure there was no
17 weapons on his person at that time.
18 Q.   You didn't conduct the pat-down but someone else did?
19 A.   Yes, sir.
20 Q.   Was there a result of that pat-down, to your knowledge?
21 A.   There was not a firearm located on him at that time.
22 Q.   Okay. Did you or one of the other officers involved with
23 the pat-down communicate that to anyone else at the scene?
24 A.   At the almost identical time Officer Caraballo, who had
25 been on the right side of the vehicle, had began walking up to

1   the passenger side to make sure there was no one ducked down in
2   the back seat or behind the vehicle, make sure there was only
3   one occupant. As he peered into the car, he could see the
4   clear handle or the butt end of a firearm.
5           MR. LISTON: Objection, your Honor.
6           THE COURT: Yes, sustained. So he goes to the
7   passenger side?
8           THE WITNESS: Yes.
9           THE COURT: What does he say?
10          THE WITNESS: He saw a firearm.
11          THE COURT: That's what he says at that point?
12          THE WITNESS: No. He yelled out "gun," which would
13  mean that there's a firearm in the vehicle.
14          THE COURT: Has he opened the door to the car yet?
15          THE WITNESS: I don't believe he did. I believe he
16  did it from looking right through the window itself.
17          MR. MOORE: Your Honor, the Court will hear from that
18  officer.
19          THE COURT: All right.
20  Q.   There's a lot going on, right? Are there a lot of police
21  officers at the scene?
22  A.   Yes.
23  Q.   And your primary concern is to find out where the weapon
24  is, is that correct?
25  A.   Yes.

1  Q.  That's why you began the procedure you began and then the
2  frisk was conducted?
3  A.  Yes.
4  Q.  Do you see the individual that was frisked that night
5  before you in the courtroom today?
6  A.  Yes.
7  Q.  If you would, please identify him by where he's sitting
8  and what he's wearing.
9  A.  Jean jacket and the headphones on.
10 Q.  I'm sorry?
11 A.  He's wearing a blue jean jacket with headphones on his
12 head.
13      MR. MOORE:  Your Honor, may the record reflect the
14 defendant has been identified?
15      THE COURT:  Yes.
16 Q.  Let me ask you one more question.  Did you -- just in your
17 short observations of the defendant that evening, that morning,
18 did he appear in any way to be incoherent?  Was there anything
19 that he said that didn't make sense?  Did he say anything?
20 A.  I don't remember him making any statements to me.
21 Q.  You've testified that you were following him in your car
22 for some distance, albeit -- can I say a short distance?  Would
23 that be accurate?
24 A.  It would be approximately maybe four to five blocks.
25 Q.  Was there anything about his driving that would indicate

1   to you that he was intoxicated?
2   A.   No.  He slowed down when I got behind him, but there was
3   nothing out of the order that I observed.
4   Q.   Did he appear to resist arrest at all?  I mean, did he
5   appear to follow your -- I'm sorry.  Please answer that.
6   A.   He didn't resist arrest.
7   Q.   Okay.  Did he appear to follow the directions of the
8   officer who was telling him what to do?
9   A.   Yes.
10  Q.   He did follow those?
11  A.   Yes.
12  Q.   All right.
13       MR. MOORE:  Nothing further, your Honor.
14  CROSS-EXAMINATION BY MR. LISTON:
15  Q.   Officer Nigohisian, before you saw the vehicle, the blue
16  BMW, the only information that you had received was the
17  information that you received from the dispatcher?
18  A.   I don't understand.
19  Q.   You stopped a car?
20  A.   Yes, sir.
21  Q.   And you stopped that car on the basis of information?
22  A.   Yes, sir.
23  Q.   Where did you get that information?
24  A.   The information came up from the dispatcher over the air.
25  Q.   That's your only source of information with respect to

1    this defendant and that incident --
2    A.    Yes.
3    Q.    -- before you stopped him?
4    A.    Yes.
5    Q.    Is it your testimony, sir, that before you stopped him you
6    actually received from the dispatch a specific license plate
7    number?
8    A.    Yes, sir.
9    Q.    And you saw that license plate number?
10   A.    Yes, sir.
11   Q.    And you followed him --
12   A.    Yes, sir.
13   Q.    -- for some time?
14         Now, before you stopped him, however, you called for
15   backup?
16   A.    Yes, sir.
17   Q.    Were you aware before he was stopped where your backup
18   was?
19   A.    I had Officer Cote was actually the next block.  When I
20   first called in, he was right at the next set of lights.  I
21   believe Officer Caraballo -- excuse me, Officer Caraballo was
22   the next responding officer who eventually --
23   Q.    Let me see if I understand this correctly.  At some point
24   somebody, one of the officers, actually made some indication to
25   the defendant to stop?

1   A. Yes.
2   Q. Was that you?
3   A. Yes.
4   Q. And before you made -- just before you made that order to
5   stop, did you physically see Officer Cote and Officer
6   Caraballo?
7   A. No, I did not.
8   Q. Did you know that they were around?
9   A. Excuse me, sir. You confused me for a second. Before I
10  asked him to stop?
11  Q. Correct, sir.
12  A. Okay. I didn't stop him until I had appropriate backup
13  units behind me.
14  Q. Did you see them?
15  A. I saw Officer Cote as he approached the lights.
16  Q. You knew he was behind you?
17  A. Yes, sir.
18  Q. And how about -- was there anybody else that you knew was
19  behind you?
20  A. Not at that time.
21  Q. So as far as you knew, when you made the order to stop,
22  you did know that Officer Cote was behind you?
23  A. Sir, I didn't make the order to stop until I had the
24  appropriate amount of officers with me.
25  Q. Did you know that Officer Cote was behind you or not?

1  A.  Sir, he was right here. I wasn't stopping the vehicle
2  until enough people showed up on the scene, is what I'm trying
3  to explain to you. At which point Officer Cote became behind
4  me. We waited for another backup unit. That's when we stopped
5  the vehicle.
6  Q.  I'm going to ask you once again. Did you stop the vehicle
7  when you knew Officer Cote was there or when you knew Officer
8  Cote and somebody else was there?
9  A.  When Officer Cote and Officer Caraballo was there.
10 Q.  You didn't stop the vehicle until you were aware from some
11 source that there were at least two other officers backing you
12 up?
13 A.  Yes, sir.
14 Q.  How did you proceed to stop the defendant's vehicle?
15 A.  I activated my lights.
16 Q.  And how much time or space after the activation of your
17 lights did the defendant's vehicle stop?
18 A.  I'd estimate a hundred feet maybe.
19 Q.  When the vehicle stopped what did you do?
20 A.  We conducted a felony stop.
21 Q.  Well, what did you actually do? You stopped your car?
22 A.  Yes.
23 Q.  Did you get out of your car?
24 A.  I got out, drew my firearm.
25 Q.  Now, what did Officer Cote do, if you saw him?

1   A.  He was to my right.  I'm not sure what he did.

2   Q.  Do you know whether he was out of his car?

3   A.  He could have been, sir.  I'm assuming he was out at some

4   point.

5   Q.  How about Officer Caraballo?

6   A.  Again, sir, I was concentrating on the vehicle.

7   Q.  Fine.  Is it fair to say, though, that in a felony stop it

8   is the procedure for an officer to draw the weapon?

9   A.  Yes, sir.

10  Q.  And would it have been the procedure for not only you but

11  Officer Cote and Officer Caraballo also to draw their weapons?

12  A.  Yes, sir.

13  Q.  Were there some instructions given to the defendant at

14  that time?

15  A.  Yes, sir.

16  Q.  Who gave those instructions?

17  A.  I believe it was Detective LeFebvre.

18  Q.  All right.  Where did he come from?  I have Cote and

19  Caraballo.  Where did LeFebvre come from?

20  A.  Sir, he was on the left-hand side.  They're unmarked.  And

21  the PA was not working in the vehicle at that time.  I couldn't

22  get it to work.  So he started yelling the commands.

23  Q.  So was that a fourth car now?

24  A.  Yes.

25  Q.  Were there -- as far as you know at that point, we have

1   yourself, Detective LeFebvre, Officer Caraballo and Officer
2   Cote, is that correct?
3   A.   There were actually more units but I can't recall.
4   Q.   There's more coming in?
5   A.   Yes.
6   Q.   Now, at some point did someone go up and physically remove
7   or ask the defendant to vacate the vehicle he was in?
8   A.   Yes.  I believe that would be Detective LeFebvre.
9   Q.   Did you participate in assisting the departure of the
10  defendant from the vehicle?
11  A.   At that point I had my firearm drawn.  I was working his
12  cover, which would be I was drawing down on the suspect in case
13  he did have a firearm, in case he turned.
14  Q.   Would it be fair to say there were six or seven officers
15  in the vicinity at that time?
16  A.   Yes.
17  Q.   All with drawn guns?
18  A.   Yes.
19  Q.   At some point the defendant was removed from the vehicle?
20  A.   I believe the defendant came out on his own, with his
21  hands up.
22  Q.   Then what happened?
23  A.   As he started walking to the rear of the car, I believe it
24  was either Detective LeFebvre or Detective Montecarvo secured
25  his hands and patted him down.

1   Q.   Well, did they cuff him?
2   A.   I don't recall, sir.
3   Q.   Did anybody put him on the ground?
4   A.   I don't recall.
5   Q.   In a felony stop, is it procedure to cuff somebody?
6   A.   Yes, it would be.
7        THE INTERPRETER: I'm sorry. What was the question?
8   Q.   In a felony stop, is the procedure to cuff them?
9   A.   Yes.
10  Q.   He was removed from the vehicle. There were half a dozen
11  or so police with guns drawn and, if procedure were followed,
12  he was cuffed?
13  A.   Yes, sir.
14  Q.   But he wasn't placed on the ground before he was cuffed,
15  face down?
16  A.   I don't recall whether he was cuffed, sir.
17  Q.   Would it be fair to say that after he was cuffed and
18  patted down -- did you testify that at some point after that
19  you heard Officer Caraballo say something?
20  A.   As he was removed from the vehicle, Officer Caraballo had
21  come up on the side to make sure there were no other occupants
22  of the vehicle. Almost simultaneously, I'd say, Officer
23  Caraballo had yelled "gun," meaning that he saw a firearm in
24  the vehicle.
25  Q.   You heard him say "gun," and you're testifying today that

1   he said that at the time that the defendant exited the vehicle?
2   A.   He was already out of the vehicle, almost towards the
3   back.  I'm not sure specifically if Detective LeFebvre or
4   Officer Montecarvo had his hands cuffed or if he was on the
5   ground or where exactly he was at the time that Officer
6   Caraballo yelled "gun."
7   Q.   Now, at this time did you notice the arrival -- first of
8   all, do you know Sergeant Carroll?
9   A.   Yes.
10  Q.   Do you know Detective Burokas?
11  A.   Yes, sir.
12  Q.   Did you notice at this time the arrival of either
13  Detective Burokas or Sergeant Carroll?
14  A.   I don't specifically recall when they arrived.
15  Q.   Did you write any reports relating to this arrest?
16  A.   I don't believe I did, sir.
17  Q.   Did you make any notes that you gave to anybody with
18  respect to it?
19  A.   Just relayed everything that I had to Sergeant Carroll.
20  Q.   If you had anything, you gave it to Sergeant Carroll?
21  A.   I just relayed to him where I saw the vehicle, how many
22  blocks, where exactly we stopped the vehicle on scene.
23  Q.   I'm going to show you what has -- what's called an
24  incident report.  I'm referring to Page 2.  I wonder, to
25  yourself first, if you would read from, "Officer Nigohisian

1  called for backup," through this paragraph. Just read it to
2  yourself. I'm going to ask you again whether that refreshes
3  your recollection with respect to the timing of when things
4  occurred.
5  A.    (Reading.)
6  Q.    Have you read that?
7  A.    Yes, sir.
8  Q.    Does that refresh your recollection in any way?
9  A.    I didn't write that report, sir, so I don't know.
10 Q.    First of all, let me ask you then, what you read, was it
11 accurate as far as you can recall?
12 A.    I saw it in a different light, but I guess --
13       THE COURT: What do you mean by that?
14       THE WITNESS: Well, in the report it states that he
15 was placed on the sidewalk. I don't remember it being on the
16 sidewalk. Again, there was a lot of stuff going around so -- I
17 didn't write this specific incident report, so different
18 officers would have different --
19       THE COURT: I understand that. What is it that your
20 memory differs from that report?
21       MR. LISTON: Your Honor, I'm going to ask, without
22 objection, that --
23 A.    Officer Caraballo had yelled "gun" as we had taken -- as
24 Mr. Diaz was out of the vehicle, so there wasn't -- a firearm
25 wasn't found on a protective sweep. It was actually observed.

1   It may have been recovered during the sweep after, but it was
2   actually observed by Officer Caraballo on scene prior to any of
3   this on the sidewalk and stuff that's written in here.
4   Q.  You said that.  Is that based on -- have you had any
5   discussions with Officer Caraballo?
6   A.  No, I haven't.  Well --
7   Q.  Since July 14, 2004?
8   A.  I'm sorry.  I've had numerous discussions with Officer
9   Caraballo but none in reference to that, if this was your --
10  Q.  Would it be fair to say that, as far as you can recall,
11  since the incident, you never had any discussion with Officer
12  Caraballo about what he saw or didn't see or how he went about
13  observing a weapon in the car?
14  A.  Not until -- well, this morning we were all together, just
15  rehashing and reading it together.  That was it.  That's the
16  only time.  In fact, Mr. Diaz is all new to me because he gave
17  us a different name on scene.  I actually didn't know his name
18  was actually Diaz until the summons for this.
19  Q.  Now, is it your testimony, though, that -- did you -- when
20  you -- when Mr. Diaz was being arrested -- I shouldn't say
21  arrested.  When he was being stopped, when they were taking him
22  out of the car, when he got out of the car, were you observing
23  him at that time and were you holding a gun on him?
24  A.  I was, yes.
25  Q.  Is it fair to say that -- now, you've claimed that you

1  heard Officer Caraballo say something about a gun in the car.
2  A. Yes, sir.
3  Q. Is it fair to say you just heard him saying something
4  about a gun in the car?
5  A. I heard him say "gun."
6  Q. But you weren't looking at him at that time, were you?
7  A. No, I wasn't. I was looking at Mr. Diaz.
8  Q. So you don't know what it was that caused him, at least
9  from your own knowledge, to determine that there was a gun in
10 the car?
11 A. No, I don't.
12 Q. So you don't know whether, in fact, he hadn't done what
13 you would call a protective sweep? What is a protective sweep?
14 A. That would be the area that he was in.
15         THE COURT: I totally lost that. I even turned the
16 microphone up loud for you, so just slow down.
17 Q. Tell those of us who are not police officers, what is a
18 protective sweep? What does that mean?
19 A. A protective sweep would be the area that he would have
20 immediate access to, any compartment that he could hide a
21 weapon, a firearm, a bat or anything we were looking for in
22 reference to.
23 Q. Is your understanding that in the stop, the stop is
24 legitimate, a police officer has the right to do a protective
25 sweep? Is that what you understood?

1   A.   Of this nature, yes, he would.

2   Q.   And that would include opening the door and looking into
3   the car for a place where a defendant might have some access to
4   a weapon?

5   A.   Yes, sir.

6   Q.   Is that what you mean by "protective sweep"?

7   A.   Yes, sir.

8   Q.   So a full-blown protective sweep could include opening a
9   door and looking into the car?

10   A.   Yes, sir.

11   Q.   But you couldn't look into any closed containers?

12   A.   No.

13   Q.   Now, is it your understanding that the defendant was not
14   arrested until after he was identified?

15   A.   I'm not specifically sure when.

16   Q.   Well, when you pulled him over -- you were part of the
17   team that pulled him over?

18   A.   Yes.

19   Q.   Were you arresting him or stopping him?

20   A.   I was stopping the vehicle, yes.

21   Q.   And you understand the distinction between a Terry stop
22   and an arrest?

23   A.   Yes, I do.

24         MR. LISTON:  No further questions.

25         MR. MOORE:  Nothing from the government, your Honor.

1          THE COURT: Thank you.

2          MR. MOORE: The government -- thank you, Officer. The

3  government would call as its next witness Officer Thomas

4  Caraballo.

5          THE COURT: As he's coming in, Mr. Liston, could you

6  state for me again -- I'm sorry -- what the motion -- I don't

7  need you -- but what the motion to suppress is based on, just

8  so I understand?

9          MR. LISTON: Your Honor, it's a fine line. In

10 Thornton, the Supreme Court decided that, even if somebody is

11 outside of a car, that there can be a search of the vehicle

12 incident to the arrest.

13         THE COURT: Right.

14         MR. LISTON: The question here is that if, for

15 example, there is only sufficient cause for a Terry stop,

16 whether somebody that is secured with handcuffs, whether

17 there's a basis for a "protective sweep" to look for evidence.

18         THE COURT: All right. So I hadn't noticed, but the

19 -- is that the government had gone into whatever statements

20 were made afterwards. It's really the basis for the stop and

21 the sweep. It doesn't go beyond that?

22         MR. LISTON: That is correct. It would affect the

23 statements afterwards if, in fact, the gun were suppressed.

24 It's not -- we're not focusing on the statements. We're not

25 saying they were made but that's not really what we --

Case 1:04-cr-10274-PBS    Document 54-29    Filed 05/17/2006    Page 20 of 20
60

1           THE COURT: It's not a voluntariness issue at this
2  point.
3           MR. LISTON: Not at this point.
4           THE COURT: So you can cut short your exam on those.
5           MR. MOORE: Absolutely, your Honor.
6  THOMAS CARABALLO, Sworn
7           THE CLERK: Thank you. Please be seated. Would you
8  please state your name and spell it for the record.
9           THE WITNESS: Officer Thomas Caraballo,
10 C-A-R-A-B-A-L-L-O.
11 DIRECT EXAMINATION BY MR. MOORE:
12 Q.   Good afternoon, Officer. If you would make sure you're
13 speaking slowly and very clearly into the microphone.
14 A.   Yes.
15 Q.   Pull that towards you so --
16      What do you do for a living?
17 A.   I'm a police officer in the city of Lawrence.
18 Q.   How long have you been doing that?
19 A.   Seven years.
20 Q.   Briefly describe your training, please.
21 A.   I went to a six-month police academy.
22 Q.   What did they teach you?
23 A.   Law, aspects of the law.
24 Q.   At approximately 12:30 a.m. on July 14, 2004, do you
25 recall what you were doing?