1   A.   Yes, I do.
2   Q.   What?
3   A.   I was on patrol.
4   Q.   Okay. Were you with another officer or by yourself?
5   A.   I was by myself.
6   Q.   All right. When you say "on patrol," were you in a car?
7   A.   Yes, I was.
8   Q.   Was it a marked police cruiser?
9   A.   Yes, it was.
10  Q.   Were you in uniform?
11  A.   Yes, I was.
12  Q.   Did you hear from the dispatch -- radio dispatch that
13  there had been a shooting somewhere?
14  A.   Yes, I did.
15  Q.   Do you recall where the shooting was?
16  A.   Yes, the LAW Grille, Amesbury and Canal Street.
17  Q.   At some point did you hear that another officer had
18  spotted a car that was involved allegedly in that shooting?
19  A.   Yes, I did.
20  Q.   Did you head to that location?
21  A.   Yes, I did.
22  Q.   All right. When you got to that location, had Officer --
23  do you know if Officer Nigohisian had already -- had he pulled
24  the car over?
25  A.   No, he had not.

1   Q.   What happened?

2   A.   I was just calling the location. He was following the car
3   so he had enough cars there to back him up to pull him over.

4   Q.   At some point could you see -- did he pull him over?

5   A.   Yes.

6   Q.   How did he do that?

7   A.   He activated his emergency lights.

8   Q.   Did the car pull over?

9   A.   Yes, it did.

10   Q.   What did you do then? What did you see Officer Nigohisian
11   do and what did you do?

12   A.   We all pulled our cruisers over.

13   Q.   Let's just talk about you if we can.

14   A.   I pulled my cruiser directly behind Officer Nigohisian's
15   cruiser.

16   Q.   What did you see Officer Nigohisian do?

17   A.   He exited his vehicle with his PA in his hand.

18   Q.   His?

19   A.   His PA, microphone.

20   Q.   Did that appear to work?

21   A.   No, it did not.

22   Q.   Why would he have had his PA microphone?

23   A.   We were conducting a felony stop.

24   Q.   With a felony stop, very briefly, what's the purpose of
25   that? Why do you do it?

1   A.  For safety reasons. We want to give clear, concise
2   orders, make sure they can hear us.
3   Q.  In this case, did one of the police officers go up to the
4   car and pull the suspect out of it or --
5   A.  No. He was ordered out of the car.
6   Q.  Okay. And so at this time what are you doing?
7   A.  I got on the passenger side in a cover position.
8           THE COURT: Excuse me. Slow down. You did what on
9   the passenger side?
10          THE WITNESS: I got into the passenger side, on the
11  passenger side, in a cover position, to cover the car.
12  Q.  When you say "cover," what's the purpose of that?
13  A.  It was a gun call. We just received a call that there was
14  a shooting and that car was involved.
15  Q.  At this point are you on the opposite side of the car as
16  the defendant -- the suspect?
17  A.  Yes.
18  Q.  Are you looking in the car?
19          THE COURT: Why don't you take us step by step. You
20  go over to the passenger side, right?
21          THE WITNESS: Yes. He was ordered --
22          THE COURT: Then tell me what happens.
23  A.  He was ordered out of the car as I approached the
24  passenger side to make sure there was no one else in the car.
25  I looked inside. I noticed there was a handgun on the

1  floorboard.
2      THE INTERPRETER: I'm sorry.
3  Q. If you would, just talk slowly.
4      Did you open the car door to get that handgun?
5  A. I opened the car door, but I did not retrieve it.
6  Q. Let me ask: Which came first? Did you open the car door
7  first, or did you spot the gun first?
8  A. I spotted the gun first.
9  Q. Was the window open, if you recall?
10 A. I don't recall if the window was open.
11 Q. Did you stick your head through the window?
12 A. I don't recall.
13 Q. You're on the outside. Are you using a flashlight?
14 A. No, I didn't. The car was lit up with spotlights from the
15 cruiser.
16 Q. You're on the outside. You see the gun.
17 A. Yes.
18 Q. What's your response?
19 A. I let all the other officers on the scene know there was a
20 gun in the car.
21 Q. How did you do that?
22 A. I verbally told everyone.
23     THE INTERPRETER: I'm sorry. Who told everyone?
24     THE WITNESS: I did.
25 Q. All right. Did you see the -- did you happen to see if

1  any of the other officers had pat-frisked the suspect that
2  night?
3  A.   Officer LeFebvre.
4  Q.   All right.  Did he -- did you see him doing that before or
5  after you spotted the gun?
6  A.   After I spotted the gun.
7  Q.   After you spotted it?
8  A.   Yes.
9  Q.   So the frisk occurs after you spot the gun?
10 A.   I wanted -- my focus was on the car at that point, after I
11 spotted the gun, then.
12 Q.   The person who they were frisking, do you see that person
13 in the courtroom today?
14 A.   Yes, I do.
15 Q.   Please identify him by where he's sitting and what he's
16 wearing.
17 A.   The desk here, with the jean jacket and the orange
18 jumpsuit.
19        MR. MOORE:  Your Honor, may the record reflect that
20 the witness has identified the defendant?
21        THE COURT:  It will.
22 Q.   When you saw this gun, did you remove it?
23 A.   No, I did not.
24 Q.   You've opened the door.  Why did you open the door?
25 A.   I opened the door to remove it, but then I let detectives

```
 1   know and they took care of it.  I didn't have any gloves or
 2   anything.
 3   Q.   Did you call any particular detective to do it?
 4   A.   Detective Burokas, who was on scene, came over right away.
 5   Q.   Did you see him remove the gun?
 6   A.   Yes, I did.
 7        MR. MOORE:  No further questions, your Honor.
 8   CROSS-EXAMINATION BY MR. LISTON:
 9   Q.   Officer Caraballo, did you write any reports at all in
10   connection with your observations that night?
11   A.   No, I did not.
12   Q.   Did you discuss your observations?
13   A.   Yes.
14   Q.   Who did you discuss them with?
15   A.   Detective Burokas.
16   Q.   And only Detective Burokas?
17   A.   Yes.
18   Q.   Did you see any reports of what happened that night?
19   A.   Yes, I did.
20   Q.   When did you see the reports?
21   A.   A couple days after and today.
22   Q.   I'm going to show you something which --
23        MR. LISTON:  Your Honor, has that been marked Exhibit
24   1?
25        THE CLERK:  Exhibit A.
```

1  Q.  I'm going to show you -- I'll show you -- why don't you
2  keep it there.  I'll show you a document which is an incident
3  report.  Is this the incident report that you say you saw?
4  A.  Yes, it is.
5  Q.  When you saw it a couple of days afterwards, was there
6  anything in the report that struck you as not accurate?
7  A.  No.
8  Q.  Now, Detective Burokas, you said, was the one who actually
9  retrieved the weapon?
10 A.  Yes.
11 Q.  How much time elapsed before you claim you saw the weapon
12 and gave a verbal response and Detective Burokas coming up and
13 retrieving that?
14 A.  Once I gave the verbal response that there was a car there
15 and --
16 Q.  There was a gun there?
17 A.  Right, that there was a gun there, I saw the gentleman was
18 being taken care of, I let him know.  He came over right away.
19 Q.  So within a matter of seconds?
20 A.  Yes.
21 Q.  So it is your testimony that Detective Burokas arrived
22 within two or three seconds --
23 A.  Yup.
24 Q.  -- of the defendant leaving the vehicle?
25 A.  Yes.

1  Q.  Did you know that there was an alleged victim in a vehicle
2  in which Detective Burokas had been?
3  A.  No, I did not.
4  Q.  Do you recall that the defendant was pointed out by
5  somebody at some point?
6  A.  No.
7  Q.  I'm going to ask you to take a look at the middle three
8  paragraphs on Page 2, starting with "Officer Nigohisian."  Just
9  read it to yourself for a moment.  I'll ask you whether that
10 refreshes your recollection in any way.
11 A.  (Reading).  Yes.
12 Q.  Does that refresh your recollection -- does that refreshed
13 recollection cause you to alter anything you've said so far?
14 A.  No, it does not.
15 Q.  Is it fair, then, to say that it was during a period of
16 time that Officer LeFebvre placed the defendant on a sidewalk
17 for a show-up -- that it was during that period of time where
18 you supposedly found the weapon?
19 A.  I wasn't involved in the show-up at all.
20 Q.  Now, this was 12:30 at night?
21 A.  Yes.
22 Q.  Was the vehicle that the defendant was operating -- was
23 that parked on a curb?
24 A.  Not that I recall.  It was pulled over to the right.
25 Q.  So it was pulled over to one side of the road?

1  A.  Yes, it was.
2  Q.  It was pulled over where a parking spot might be, correct?
3  A.  It could be.
4  Q.  There wasn't a car between you and the defendant's
5  vehicle, was there, when --
6  A.  Officer Nigohisian's car was --
7  Q.  Officer Nigohisian's car was behind?
8  A.  Behind.  My car was behind Officer Nigohisian's car.
9  Q.  So that the defendant's car was in front?
10 A.  Yes.
11 Q.  So is it fair to say that the only police lights that were
12 shining were lights from the back?
13 A.  No, because there was other cruisers all over.
14 Q.  What do you mean "all over"?
15 A.  All over the street.  Everyone on the shift responded to
16 the call.
17 Q.  Well, were there any lights shining from the right?
18 A.  There were cruisers pulled into the middle of the road,
19 yes.
20 Q.  That wouldn't be from the right, would it?
21 A.  What do you mean?
22 Q.  That would be from the left?
23 A.  From the left, yes.
24 Q.  There was no lights shining from where you were supposedly
25 standing?

1   A.   No.
2   Q.   There was a front seat?
3   A.   Yes, there was.
4   Q.   And you looked in the front seat?
5   A.   I looked in the front window.
6   Q.   And how much space between the end of the seat and the
7   dashboard was there?
8   A.   I couldn't tell you, a couple feet maybe.
9   Q.   A couple of feet?
10  A.   Yeah.
11  Q.   Where did you see the weapon?
12  A.   On the floorboard in front of the seat.
13  Q.   In plain view?
14  A.   In plain view.
15  Q.   So it is your testimony -- was it the entire weapon that
16  was visible to you?
17  A.   Yes, it was.
18  Q.   Did you identify it -- what kind of weapon did you
19  identify it as?
20  A.   I didn't identify it as a weapon.  I identified it as a
21  handgun on the floorboard.
22  Q.   Now, do you see where this says, "Officer Caraballo found
23  under the passenger's front seat a .45-caliber handgun loaded"?
24  A.   It was not under.
25  Q.   Didn't I ask you to read this and whether there was

1 anything in there that was not correct?
2 A. I didn't write the report, sir.
3 Q. You saw it a couple days later, and you didn't change it,
4 did you?
5 A. I can't change someone else's report.
6 Q. You could suggest to them that the report is incorrect,
7 couldn't you?
8 A. I could.
9 Q. But you didn't?
10 A. No.
11 Q. So it's your testimony now that you didn't find it under
12 the passenger seat?
13 A. No, I did not, sir.
14 Q. It wasn't under the passenger seat?
15 A. No, it was not.
16 Q. It was on the floorboard?
17 A. Yes, it was.
18 Q. And the entire firearm was visible to you?
19 A. Yes, it was, sir.
20 Q. Now, you didn't know it was loaded, did you?
21 A. No, I did not.
22 Q. Is it fair to say that as far as you knew what -- Sergeant
23 Carroll wrote this report, right?
24 A. That's correct.
25 Q. Sergeant Carroll's report says that the weapon was under

1   the passenger seat?
2   A.   That's correct.
3          THE INTERPRETER:   It was what?
4          MR. LISTON:   Under the passenger seat.
5   Q.   You say that that's incorrect?
6   A.   Correct.
7   Q.   Now, did you talk to Sergeant Carroll today?
8   A.   Did I talk to him today?  Yeah.
9   Q.   And did you meet with him and others in connection with
10  your testimony today?
11  A.   Yes, I have.
12  Q.   And did you tell him about that?
13  A.   I did.
14  Q.   What did you tell him?
15  A.   I told the gentleman that I saw the firearm in plain view
16  on the floorboard.
17  Q.   Now, did you ever tell anybody before today that you saw
18  the firearm in plain view completely on the floorboard?
19  A.   Yeah, the day of the incident.
20  Q.   Who did you tell on the day of the incident?
21  A.   Detective Burokas.
22  Q.   You told that to Detective Burokas?
23  A.   Yes.
24  Q.   That you saw it on the floorboard?
25  A.   Yes.

1  Q.  Entirely?

2  A.  Yes.

3  Q.  You made it absolutely clear to him?

4  A.  Absolutely.

5  Q.  There's no doubt about that?

6      MR. MOORE:  Asked and answered, your Honor.

7  Q.  Did you remind him of that today, this morning, when you
8  were talking about it?

9  A.  No, I did not.

10 Q.  Did he say anything about it?

11 A.  No, he did not.

12     THE COURT:  Did you talk to him this morning?

13     THE WITNESS:  Yes, we did.

14 Q.  You talked to Sergeant Carroll as well?

15 A.  Yes, I did.

16 Q.  Was he surprised, to your knowledge?  Did he seem
17 surprised when you told him you actually saw the entire gun on
18 the floorboard?

19 A.  No, he did not.

20     MR. LISTON:  No further questions, your Honor.

21     MR. MOORE:  No questions, your Honor.

22     THE COURT:  Thank you.

23     MR. MOORE:  Your Honor, the government would call as
24 its next witness Officer Charles Carroll.

25     Your Honor, I hadn't planned on calling this witness.

1  This will be very quick.  There's one additional witness after
2  this which I expect would also be very quick, the booking
3  officer.
4         THE COURT:  Why do you need the booking officer?
5         MR. MOORE:  Because he's the one who read the Miranda
6  rights, which is asserted in the defendant's suppression
7  motion.
8         THE COURT:  We don't need that.
9         MR. MOORE:  He also heard the defendant's statement.
10        THE COURT:  What does it matter?
11        MR. MOORE:  Well, because in his papers, the defendant
12 sought to suppress the --
13        THE COURT:  It's fruit of poisonous tree stuff.
14 That's exactly why I asked Mr. Liston that question.
15        MR. LISTON:  That's right, your Honor.
16        MR. MOORE:  May I add, your Honor, that the Court may
17 not be aware.  I think it's found in the police report.
18 Actually, it's a different police report.  There were also --
19 just for the Court's consideration, there were shell casings
20 which were matching found in the lot and the suppression
21 statements conceivably could be involved in that.  And the
22 defendant has not moved for those spent cartridges.
23        THE COURT:  All I've got is what I've got right now.
24 As I understand the case, it's -- why don't we just get through
25 this witness, and we'll see whether we need the last one.

1    MR. MOORE: Yes, your Honor. Thank you.

2    CHARLES CARROLL, Sworn

3    THE CLERK: Please be seated. Would you state your

4 name and spell it for the record, please.

5    THE WITNESS: Yes. My name is Sergeant Charles

6 Carroll, C-A-R-R-O-L-L, Lawrence Police Department.

7 DIRECT EXAMINATION BY MR. MOORE:

8 Q.  Good afternoon.

9 A.  Good afternoon.

10 Q.  Please speak clearly and slowly, if you will.

11 A.  Yes, sir.

12 Q.  What do you do for a living?

13 A.  I --

14 Q.  How long have you been doing that for a living?

15 A.  Approximately 28 years.

16 Q.  Briefly describe your training, please. Briefly describe

17 your training.

18 A.  I've gone to a police academy in the late 1970s. I've

19 gone to numerous seminars, in-service training every year.

20 Q.  On the night of July 14, 2004, at approximately 12:30

21 p.m., where were you?

22 A.  At that time I was in the Lawrence police station.

23 Q.  All right. Were you with any other officers right then?

24 A.  I was with Detective Burokas.

25 Q.  Did you become aware of a shooting that had occurred at

1   the LA Grille?
2   A.   Yes, sir, I did.
3   Q.   How did you become aware of that?
4   A.   The victim came to the station to report it.
5   Q.   Were there any calls that were made into the station that
6   you were aware of, 911 calls?
7   A.   Yes. As a result of that, yes, there were calls to the
8   station, yes.
9   Q.   Okay. The victim said a shooting had occurred, right?
10  A.   That's correct.
11  Q.   Were you then with Detective Burokas the rest of the
12  evening through this incident?
13  A.   Yes, sir.
14  Q.   Were you then driving the car with Mr. Edison Gonzalez in
15  it?
16  A.   Yes, sir.
17  Q.   And did you eventually end up at the scene where the
18  suspect's car had been pulled over?
19  A.   That's correct, yes, sir.
20  Q.   Are you the police officer, the sergeant, who had -- who
21  wrote the report in this case?
22  A.   Yes, sir, I did.
23  Q.   All right. Let me ask you, in writing that report, how
24  did you consult with the other officers involved?
25  A.   I spoke to all of the officers individually that were

1    involved in the report, got from them exactly what they did,
2    and then I transcribed it into a police report.
3    Q.    All right.  Is that meant to be a synopsis of what
4    happened that evening of the essential facts?
5    A.    Yes.
6    Q.    Do you submit it to them literally for their approval
7    before you proceed with the final draft of it?
8    A.    No, sir, I do not.
9    Q.    All right.  Do you ask them to take a look at it?
10   A.    No, sir, I do not.
11   Q.    Do you recall asking any of them to take a look at it in
12   this case before you --
13   A.    No, sir, I do not.
14   Q.    Do you believe that you were aware of each and every fact
15   as it occurred that evening?
16   A.    To the best of my knowledge, yes, sir.
17   Q.    All right.  When you say -- when I say "facts," I'm
18   referring to the essential facts involved in this case.  Is
19   that what you're referring to?
20   A.    Yes, sir.
21   Q.    Now, in your report, you refer to a protective sweep being
22   done prior to the defendant being identified.  Now, what, to
23   you, is a protective sweep?
24   A.    That's just a sweep of the interior of the car, under the
25   driver's seat, passenger seat, for any weapons that could be

```
 1   used.
 2   Q.   Okay.  In this case, were you in a position to hear
 3   Officer Caraballo that night?
 4   A.   To hear him?
 5   Q.   Yeah.  Let me ask more specifically.  Did you hear him
 6   yell "gun"?
 7            MR. LISTON:  Objection, your Honor.  Somewhat leading.
 8            THE COURT:  Well --
 9   A.   No, I did not hear that.
10   Q.   You didn't hear him yell "gun"?
11   A.   No.
12   Q.   How far away from Officer Caraballo were you?
13   A.   At the specific car, I was probably maybe about 30 or 40
14   feet away.
15   Q.   Were there a lot of lights and a lot of action?
16            THE COURT:  You know what?  I know it's late in the
17   day but he was a percipient witness, too, so let's not lead so
18   much.
19            MR. MOORE:  I'm not sure how to ask --
20   Q.   Was there a lot going on?
21   A.   Yes, sir, there was.
22   Q.   Could you describe what was going on?
23   A.   Yes.  There were a number of police officers there, a
24   number of marked cruisers with blue lights, spotlights.  There
25   were some unmarked units.  They had the individual out of the
```

1    motor vehicle.  We had a victim.

2              THE COURT:  Know what?  Can we just back up for a

3    minute.  You were there.  Tell it to us as you remember right

4    now.  I understand -- why don't you just tell us, as you

5    arrived, what you saw, what you heard.  Not the royal "we."

6    What you remember.

7    A.    I remember I arrived on the scene with Detective Burokas.

8    I observed a number of marked cruisers with lights, spotlights.

9    I saw a blue BMW.  I saw an individual being removed by two

10   uniformed police officers from that BMW.  I saw other officers

11   near the BMW.

12             At this time I walked up to where the two officers had

13   the individual.  I saw that he was handcuffed.  And I went back

14   to my car where I had the victim take a look at the individual.

15   The victim identified him as the person that shot him.  And

16   that person is Mr. Rivera.

17             THE COURT:  What person?

18             THE WITNESS:  Excuse me, your Honor?

19             THE COURT:  Wait a minute.  You asked the victim to

20   identify him.

21             THE WITNESS:  I asked the victim if he could identify

22   the person that shot at him.  He pointed to Mr. Rivera, said,

23   "That's the person that shot at me."

24   Q.    Do you see the person known to you at that time as Mr.

25   Rivera in the courtroom today?

1   A.   Yes.

2   Q.   Please identify him by where he is sitting and what he is
3   wearing.

4   A.   He's sitting right next to the defense counsel, wearing a
5   blue jacket.

6       MR. MOORE:  Your Honor, may the record reflect that
7   the witness has identified the defendant?

8       THE COURT:  Yes.  Let me just say, is there a
9   stipulation?  I'm confused on the names.  Is that a different
10  name?

11      MR. MOORE:  Well, unfortunately, your Honor, there's
12  an issue in this because the defendant starts with being an
13  illegal alien in possession.  He identified himself that night
14  as Jose Rivera.

15      THE COURT:  Is that the name that the defendant
16  identified himself as?

17      THE WITNESS:  Yes, your Honor.

18      THE COURT:  I need to know the genesis of the name.
19  That's all.

20  Q.   You wrote in your report about a show-up on the sidewalk.

21  A.   That's correct.

22  Q.   What's a show-up on a sidewalk, generally?

23  A.   A show-up on a sidewalk is, shortly after an incident,
24  just a one-on-one with the victim of a crime and the possible
25  perpetrator of a crime.