1  Q.    So you've written here that, "I, Sergeant Carroll, had
2  CPOP LeFebvre place Mr. Rivera on the sidewalk for a show-up."
3         THE INTERPRETER:  I'm sorry.  What's CPOP?
4         MR. MOORE:  I'm sorry.  I don't know, CPOP.  Do you
5  know what CPOP is?
6         THE WITNESS:  Yes.  Community policing officer, your
7  Honor.
8         MR. MOORE:  Thank you, sir.
9         THE COURT:  So what's the final "P"?
10        THE WITNESS:  What's the final what?
11        THE COURT:  CPOP.
12        THE WITNESS:  Community police officer -- I don't know
13 to be honest with you.  That's all we call them.
14 Q.    When you say that he was placed on the sidewalk, was he
15 upright or was he face down on the sidewalk?
16 A.    He was standing.
17 Q.    He was standing on the sidewalk.
18        Is it possible that -- you wrote in your report that
19 Officer Caraballo found under the passenger's front seat a
20 .45-caliber handgun loaded.  Now --
21        THE COURT:  Where did you get that from?
22        MR. MOORE:  I'm sorry.  I referred earlier to
23 Government's Exhibit A.  I haven't showed it to the defendant
24 because I don't have an extra copy.
25        THE COURT:  It's just a question.  Do you remember

Case 1:04-cr-10274-PBS    Document 54-31    Filed 05/17/2006    Page 2 of 17

82

1   where you got that information?
2   THE WITNESS: Yes. Officer Caraballo was standing by
3   the passenger side of the motor vehicle. He called Detective
4   Burokas. I went over, too, and I observed the weapon in the
5   car. And Detective Burokas at that time put on some gloves and
6   removed the weapon from the motor vehicle.
7   THE COURT: Where did you see the gun?
8   THE WITNESS: I saw it under the passenger seat. The
9   handle of the weapon was sticking out.
10  Q.   To your knowledge, had it been moved by either other
11  officer that you talked about?
12  A.   To the best of my knowledge, no.
13  Q.   Do you have any -- in writing your report, is it possible
14  that you've written some conclusory statements?
15  MR. MOORE: Objection, your Honor.
16  THE COURT: Sustained.
17  Q.   Is it possible that in your report you've written --
18  MR. MOORE: I'm sorry. May I finish the question,
19  your Honor?
20  MR. LISTON: I haven't said anything.
21  Q.   Is it possible that you relied on the statements of other
22  individuals in preparing this report?
23  A.   Yes, sir, it was, yes.
24  Q.   Is it possible that in writing your report you relied on
25  conclusions that were made as a result of the entire

1  investigation that evening?
2  A.   Yes, sir.
3       MR. MOORE:  All right.  Thank you, your Honor.
4  CROSS-EXAMINATION BY MR. LISTON:
5  Q.   Is it Sergeant Carroll?
6  A.   Yes, sir.
7  Q.   Sergeant Carroll, you testified that you don't have other
8  officers review reports that, in part, you garner information
9  that may have been supplied by them, is that correct?
10 A.   That's correct, sir.
11 Q.   But you're confident, then, that the report you write
12 accurately state what they told you?
13 A.   Yes, sir.
14 Q.   And when you -- did you interview or speak with Officer
15 Caraballo before you made your report?
16 A.   Yes, sir.  I spoke to him that night, yes, sir -- or that
17 morning, actually.
18 Q.   Now, when you went over and took a look in the car with
19 Detective Burokas, the door was open, wasn't it?
20 A.   I don't recall.  It may have been.  I don't recall.
21 Q.   But you did say -- when you saw it, you said that the --
22 where was the weapon?
23 A.   The weapon was under the passenger seat with the handle
24 sticking out.
25 Q.   Well, you say "the handle was sticking out."  You're

1    saying that the handle wasn't under the passenger seat?
2    A.    It was under the passenger -- the gun was under the
3    passenger seat with the handle sticking out.
4    Q.    Sticking out where?
5    A.    Onto the floor where it could be seen.
6    Q.    How could it be seen?  If you look in after you open the
7    door?
8    A.    If you looked in the car, you could see it, yes.
9    Q.    Did you look into the car with the window --
10   A.    I don't know whether the door was open or closed, but
11   that's where it was in the car.
12   Q.    You don't recall how you saw it?
13   A.    I saw it with my eyes.  It was where I told you it was.
14   But I don't recall whether the door was open or closed.
15   Q.    You don't know what angle you were looking at?
16   A.    I was looking down.
17   Q.    You don't know whether you were in front a little bit,
18   behind a little bit?
19   A.    No.
20   Q.    Directly across?
21   A.    I was at the passenger door.  I don't know the angle, sir,
22   no.
23   Q.    And do you recall how much space between the end of the
24   passenger seat and the dashboard of the BMW there is, how much
25   space there is?

```
 1   A.   How much space?
 2   Q.   How much space, right.
 3   A.   Regular car.  I don't know what you mean by "how much
 4   space."
 5   Q.   Well, how much of the floorboard can you see from the
 6   outside?
 7   A.   If you're looking in, you can see the entire floor.
 8   Q.   You can see the entire floor?
 9   A.   Yes.
10   Q.   How much of the floor?
11   A.   The whole floor.
12   Q.   You can't see the floor that's under the seat, can you?
13   A.   No, sir.  You can see the floor that's visible without the
14   seat obstructing anything.
15   Q.   Now, is this your statement?  I'll read it.  "I, Sergeant
16   Carroll, had CPOP LeFebvre place Mr. Rivera on the sidewalk for
17   a show-up"?
18   A.   That's correct.
19   Q.   "As we had the victim Edison Gonzalez in the car and had
20   already stated he knew the shooter but not by name"?
21   A.   That's correct.
22   Q.   "I, Sergeant Carroll, walked back to the car and Mr.
23   Edison Gonzalez was pointing, 'That's him, that's him'"?
24   A.   That's correct.
25   Q.   Now, is it fair to say that when you arrived the other
```

1   officers were already there?
2   A.   Yes, they were, yes.
3   Q.   In fact, the defendant was already out of the car?
4   A.   Yes, he was out the car, yes.
5   Q.   And he was already handcuffed, wasn't he?
6   A.   I believe he was, yes.
7   Q.   In fact, as far as you know, he didn't see him being
8   frisked, did you?  He had already been frisked, presumably?
9   A.   Yes.
10  Q.   So that all had taken place?
11  A.   That's correct.
12  Q.   You didn't hear any words from Officer Caraballo?
13  A.   No, sir, I did not.
14  Q.   During this time -- I'm just referring to the time of this
15  -- when Mr. Edison is supposedly pointing to the defendant --
16  Officer Caraballo made a protective sweep of the motor vehicle?
17  A.   That's correct.
18  Q.   So this protective sweep of the motor vehicle was made
19  after the defendant was already in cuffs, after you had gotten
20  out of the car, and after you had walked toward the car and
21  after Mr. Edison Gonzalez had identified him?
22  A.   I don't know -- I don't think it was before he was
23  identified.  It was after the individual, Mr. Rivera, was taken
24  from the motor vehicle.
25  Q.   How do you know that?

1   A.   Because I was on the scene at that point.
2   Q.   You didn't hear Officer Caraballo?
3   A.   I didn't hear Officer Caraballo, no.
4   Q.   How do you know what the sequence was?
5   A.   Because -- I spoke to Officer Caraballo.
6   Q.   And did Officer Caraballo tell you that he found the
7   weapon sometime after?
8   A.   Yes.  Officer Caraballo told me that when he approached
9   the car he could see the weapon in plain view, on the floor,
10  with the handle sticking out, as we saw.
11  Q.   That is a rather significant detail, isn't it, that he saw
12  it in plain view?
13  A.   Yes, sir.
14  Q.   That's not in your report, is it?
15  A.   I don't know.  I'd have to read the report.
16  Q.   Read the report, sir.
17  A.   It says, "Officer Caraballo let us know that the handgun
18  was under the passenger front seat."
19  Q.   You don't know how he saw it?  You don't know whether he
20  opened the door or not?
21  A.   I'm just telling you what he told me, that he saw it when
22  he approached the motor vehicle.
23  Q.   You just said he said he saw it in plain view?
24  A.   That is correct.
25  Q.   You didn't put that in your report, did you?

1    A.    No, sir.

2    Q.    And you spoke with Officer Caraballo?

3    A.    Yes, sir, I did.

4    Q.    You spoke to him after you produced this report and some

5    other times, didn't you?

6    A.    Did I speak to him after we produced the report?

7    Q.    Right.  Did you ever correct the report in any way?

8    A.    Did I?  No.

9    Q.    It's your testimony today that he told you that he saw a

10   gun in plain view -- or a portion of a gun in plain view?

11   A.    That's correct.

12   Q.    That's not in your report?

13         MR. MOORE:  Your Honor, asked and answered multiple

14   times.

15         MR. LISTON:  Credibility, your Honor.

16         THE COURT:  Finish up because we're getting close to

17   5:00.

18         MR. LISTON:  I have nothing more with this witness,

19   your Honor.

20         MR. MOORE:  I have nothing further, your Honor, of

21   this witness.  Thank you, Sergeant.

22         THE WITNESS:  Thank you.

23         MR. MOORE:  Your Honor, does the Court want me to

24   bring in the booking officer who read the Miranda rights to

25   this --

Case 1:04-cr-10274-PBS    Document 54-31    Filed 05/17/2006    Page 9 of 17

89

1  THE COURT: I don't think I need it unless there's a
2  challenge to the voluntariness of the statements, which I'm not
3  hearing.
4  MR. MOORE: I would agree with the Court for a
5  different reason. I don't believe there's been a basis for
6  that being suppressed. But I'm concerned that this should be
7  tied up because the defendant may find a way to challenge -- I
8  think that if the Court found that this gun and the ammo that
9  was found in it should be suppressed the government would
10 intend to proceed with spent shell casings that were found in
11 the parking lot by the police.
12      It's unclear to me -- it doesn't appear that the
13 defendant's asking for that to be suppressed. In that event,
14 the statements that were made by the defendant are something
15 that the government would seek to bring in at that trial later
16 on, your Honor.
17      THE COURT: Until Mr. Liston decides to challenge it
18 -- right now I just have the challenge to the Terry stop and
19 sweep.
20      MR. LISTON: Your Honor, I think that's correct. It
21 would be my position that if the Court were to suppress the
22 weapon they suppress the shell casings. They can't be attached
23 to the weapon. It's the fruit of the poisonous tree. There's
24 just no way they can get that in.
25      We're not going to suggest -- at least I don't have a

1  basis to suggest -- that he didn't sign a Miranda warning.
2  We're not saying that he ever said what's claimed here, but I
3  can't make that as the basis for a motion of suppress because
4  that's a matter of credibility.
5           THE COURT:  All right.
6           MR. LISTON:  But I would suggest that if the Court
7  were to -- I want the gun, the weapon, and all the fruits of
8  the weapon, which would include any matching of the shell
9  casings to the weapon.  So I don't believe that the booking
10 officer is --
11          MR. MOORE:  Your Honor, it actually wouldn't be
12 required from the government's point of view.
13          THE COURT:  Let's just hear the argument on this.  If
14 we need that later we will -- it's two minutes of 5.  And you
15 both briefed it, right?
16          MR. MOORE:  Yes, your Honor.
17          MR. LISTON:  I haven't briefed it in any kind of
18 exhaustive way, your Honor, because I didn't know exactly what
19 was going to happen with respect to the --
20          THE COURT:  Hold on one second.  I asked her to find
21 the name of that Supreme Court case.  What's the name of it?
22          THE LAW CLERK:  <u>Muehler vs. Mena</u>.
23          THE COURT:  I haven't, obviously, read it with this
24 case in mind, but I think it was a recent case.
25          MR. LISTON:  I'm sorry.  The name was?

1          THE LAW CLERK: M-U-E-H-L-E-R, vs. Mena, M-E-N-A. It
2   was March 22nd.
3          THE COURT: Did it have a -- did you look at the case
4   cite?
5          THE LAW CLERK: At the top there was -- they ruled --
6   he was in handcuffs when there was a protective order for two
7   to three hours.
8          THE COURT: It's not a car stop, but it deals with,
9   within the last week, the issue of somebody in handcuffs.
10         MR. LISTON: It sounds like a significant case, your
11  Honor.
12         THE COURT: You should take a peek at it. I just
13  happened to remember it as I was reading your papers. I don't
14  know if it's important or not, but you should probably take a
15  look at it and if you want, you know, supplement quickly with a
16  brief on the point if you think it's relevant. And I should
17  read it myself.
18         MR. LISTON: Yes, your Honor.
19         THE COURT: Go ahead.
20         MR. LISTON: There are some other factors brought up.
21  I -- actually, Mr. Moore has briefed the issues generally and
22  rather broadly and well. There has been no indication -- there
23  was nothing to my mind that there was going to be a plain-view
24  suggestion here which kind of opens it up, makes it a different
25  case entirely.

```
 1            THE COURT:  Can I ask you this?  It sounds as if
 2   there's a basis for a stop on reasonable suspicion.
 3            MR. LISTON:  I have a very difficult time suggesting
 4   that there wasn't a basis for a Terry stop.
 5            THE COURT:  As a basis for a stop, even if they had
 6   gone inside the car, under Thornton, why wouldn't that be okay?
 7   Assuming your best case now, that they actually opened the door
 8   and saw it wedged in there.
 9            MR. LISTON:  If it was only a Terry stop, if the basis
10   for the stop was only the reasonable suspicion that's necessary
11   for the Terry stop, the argument is that it's distinguishable
12   from Thornton because Thornton was a probable cause for an
13   arrest.
14            THE COURT:  I see.
15            MR. LISTON:  And the -- you take the concurrences and
16   the dissents, it's unclear that this concept of being able to
17   protect yourself when the defendant is already secured permits
18   the police to go and search, in this case, for evidence.  So
19   that is the sort of small road that's an inroad.
20            I will say, frankly, other circuits have dealt with it
21   and have applied Thornton.  The First Circuit hasn't done it.
22            THE COURT:  It's an uphill battle.  Why don't you do
23   this:  If you want to submit something else on it, can you do
24   it within a week?
25            MR. LISTON:  Yes, your Honor.
```

1      THE COURT:  Do you want -- if you want to do anything
2  additional -- I may be remembering that case wrong, but you
3  should look at the recent Supreme Court case.  If there's
4  anything additional you want to submit, do it within the next
5  week.
6      Let me ask you this:  Assuming for a moment that
7  there's a trial, where are we going with this case?  Are you
8  both ready to try it?
9      MR. LISTON:  I think we have a trial date, your Honor.
10     THE COURT:  When is it?
11     MR. LISTON:  July 25th, I think it is.
12     MR. MOORE:  It's in July, your Honor.
13     THE COURT:  Do you need that much time?
14     MR. MOORE:  You've essentially heard the government's
15 case today, your Honor.
16     THE CLERK:  The 25th.
17     MR. LISTON:  I would like it for a couple of reasons,
18 your Honor.  Part of it is I think it's also an uphill battle
19 with respect to attempting to find out what, if any, of the
20 prior convictions I can vacate.
21     THE COURT:  You did mention --
22     MR. LISTON:  I think that was one of the reasons for
23 kicking it over.
24     THE COURT:  You reminded me.  That's fine.  Let me
25 just say that for reasons beyond my control I just had an

1  eight-week trial -- 12-week trial moved into the fall.  I've
2  actually got time this spring.  If anyone wants that date
3  they've got it.  But, otherwise, I'll keep you on the July
4  track.
5        MR. LISTON:  I don't know whether your Honor wants to
6  have it done and -- the question, of course, is that if Officer
7  Caraballo was believed and that the weapon was found in plain
8  view without even opening the vehicle, that's a separate
9  question.  I'm not even going to bother to brief that aspect of
10 it.
11       THE COURT:  Here's the problem.  Assume for a minute
12 it isn't the whole gun just sitting there.  If it was the
13 memory of other police officers who corroborate this that think
14 that at least the handle was visible through the window.  So
15 while the report supports your view, I think the three police
16 officers said they saw the handle, am I right?  Carroll --
17       MR. LISTON:  That means -- your Honor, frankly
18 speaking, that means nothing to me.
19       THE COURT:  Burokas.
20       MR. LISTON:  Burokas.
21       THE COURT:  And so the three of them are saying they
22 saw something looking through the window.  Now, I understand
23 the report says otherwise, which is fair grounds for challenge.
24 I'm just simply saying it --
25       MR. LISTON:  I understand what you're saying, your

1  Honor. Unfortunately, my experience has been that I've seen
2  and heard multiple police lying, and I firmly believe it, and I
3  think it happened in this case. Whether that makes a
4  difference is a separate question.
5       THE COURT: Whether the full gun was seen.
6       MR. LISTON: Your Honor, I had a case -- this is a
7  funny story. I talk about this case many times, where three
8  police officers got on the stand and told a completely bogus
9  story. And there's no question in my mind or anybody else's
10 mind that it happened. It's very hard for me to deal with
11 that. I understand it creates a problem. When they say that,
12 they say that and there's not much you can do. I'm not trying
13 to put the Court -- I'm not going to try to brief that issue.
14      THE COURT: Don't.
15      MR. LISTON: I can't, as a practical matter.
16      THE COURT: The only issue that I'll ask you to look
17 at is the following: Assuming for a minute that the report is
18 accurate and the police officers are misremembering it -- let's
19 put it that way -- assume for a minute that that is the case.
20 It may well be in these circumstances that they had the right
21 to go into the car.
22      MR. MOORE: That's the government's position, your
23 Honor, as outlined in the brief.
24      MR. LISTON: And I --
25      MR. MOORE: If I may.

```
 1            MR. LISTON:  I acknowledge, your Honor, that's an
 2   uphill matter.
 3            THE COURT:  Okay.  If anyone wants to do anything with
 4   that Supreme Court case, do it within the week.  Otherwise, I
 5   will see you in July.  You had told me.
 6            MR. LISTON:  The 18th is the final pretrial conference
 7   date, too, your Honor.
 8            THE COURT:  Do you want to see me?  You want --
 9            MR. LISTON:  The 18th of July.
10            THE COURT:  The 18th of July.  How many priors are
11   there?
12            MR. LISTON:  At least six, your Honor.
13            THE COURT:  See you then.
14            MR. MOORE:  Thank you, your Honor.
15   (Whereupon, at 5:05 p.m. the hearing concluded.)
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

I, Cheryl Dahlstrom, RPR, RMR, and Official Reporter of the United States District Court, do hereby certify that the foregoing transcript, from Page 1 to Page 96, constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 04-10274, United States of America vs. Tony Diaz.

*Cheryl Dahlstrom*

Cheryl Dahlstrom, RPR, RMR

Official Court Reporter