# United States Court of Appeals
## For the First Circuit

No. 06-2378

UNITED STATES OF AMERICA,

Appellee,

v.

TONY DIAZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

William A. Hahn, by Appointment of the Court, with whom Hahn & Matkov was on brief for appellant.

Mark T. Quinlivan, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, and Paul R. Moore, Assistant U.S. Attorney, were on brief for appellee.

March 7, 2008

**STAHL, Senior Circuit Judge.** Defendant-appellant Tony Diaz was convicted of one count of possession of a firearm and ammunition by an illegal alien. He was sentenced to 262 months in prison followed by 60 months of supervised release. Diaz appeals the district court's denial of his motion to suppress evidence, his conviction, and the sentencing enhancement imposed pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). After considering Diaz's various arguments on appeal, we affirm his conviction and sentence.

## I.  Background

On July 14, 2004, at approximately 12:30 a.m., shots were fired at Edison Gonzalez and his brother Henry while they were sitting in their car in a restaurant parking lot in Lawrence, Massachusetts. The Gonzalez brothers immediately called 911 and informed the police that they had been shot at by a drunk man driving a blue BMW, license plate number 3703ZE. The brothers then drove to the Lawrence police station where they met with Detective Brian Burokas and Sergeant Charles Carroll. Edison told the detectives that he could identify the shooter and that he knew where the shooter lived, though he did not know the shooter's name. Edison accompanied the detectives to the apartment that he believed to be the residence of the shooter, but the shooter was not there.

After the police received the call from the Gonzalez brothers, the BMW's description and license plate number were

-2-

broadcast over the dispatch, along with a warning that the shooter might be drunk. Sometime thereafter, Officer Kevin Nigohisian, who was on patrol in a marked police cruiser, spotted a blue BMW with license plate 3703ZE. Officer Nigohisian followed the BMW in his patrol car and called for back-up. Once back-up arrived, Nigohisian activated his lights and signaled the BMW to pull over. By that time, several other police cars had arrived at the scene. Four of the officers exited their cars with guns drawn and ordered the driver out of the vehicle. Two of the officers patted down the driver and placed him in handcuffs. Shortly afterwards, Officer Thomas Caraballo, who had approached the BMW to ascertain whether there were any other occupants, opened the passenger-side door and leaned into the car. Caraballo then spotted the handle of a gun protruding from beneath the passenger seat and called out to alert the other officers.[1]

---

[1] At the suppression hearing, Officer Caraballo testified that before opening the door, he looked through the car window and discerned the gun in plain view on the floorboard in front of the passenger seat. The district court did not find this testimony credible, noting that Detective Burokas testified that Caraballo was leaning into the car when he announced that he had found a gun and that the police report indicated that the gun was found under the passenger seat during a protective sweep of the vehicle. Officer Nigohisian's and Sergeant Carroll's testimony, however, buttressed Caraballo's version of events, and the evidence indicates that Detective Burokas arrived at the scene slightly later than the first wave of officers and thus may not have been present when Caraballo initially approached the BMW. We do not consider this to be a particularly important evidentiary point to resolve. As discussed below, whether Caraballo espied the gun in plain view or discovered it in the course of a protective sweep, Diaz's Fourth Amendment rights were not violated.

-3-

Almost contemporaneously, Detective Burokas and Sergeant Carroll arrived at the scene with Edison Gonzalez still in tow. From the backseat of Carroll's car, Edison identified the driver of the BMW as the alleged shooter. Responding to Officer Caraballo's discovery of a gun, Detective Burokas approached the BMW, donned latex gloves, and removed a .45 caliber handgun from underneath the front passenger seat. He unloaded the weapon and found three rounds of live ammunition in the clip. The driver was then arrested and taken into custody by the police.

At booking, the driver gave the name "Jose Rivera" along with a date of birth. He was advised of his Miranda rights in Spanish, both orally and in written form, and indicated that he understood his rights. An officer asked "Rivera" in Spanish whether he had a license to carry the gun, to which he answered that he had no permit and that he had purchased the gun on the street for $300. After the officers fingerprinted him, his Social Security number was run and two names--Jose A. Rivera, Jr., and Tony Diaz--were returned.

On September 8, 2004, a federal grand jury indicted Diaz on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count I) and one count of possession of a firearm and ammunition by an unlawful alien in violation of 18 U.S.C. § 922(g)(5)(A) (Count II). Diaz moved to suppress the evidence seized by police during the search of the

-4-

BMW, arguing that the "protective sweep" of the car after he was handcuffed was a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures.[2]  The district court denied Diaz's motion to suppress, concluding that the sweep of the defendant's vehicle did not violate the Fourth Amendment because it was not unreasonable for police "to conduct a protective search after putting a suspect in handcuffs during a Terry stop so that the suspect may be released from handcuffs as soon as police safety is assured." United States v. Diaz, No. CRIM.A.04-10274, 2005 WL 1027437, at *3 (D. Mass. Apr. 29, 2005).

A three-day jury trial began on November 7, 2005.[3]  On the second day of the trial, Joann Sassone, a Records and Information Services Officer for the Boston District Office of Citizenship and Immigration Services, Department of Homeland Security ("DHS"), testified that the Alien Registration number for Diaz was A90567004, but that previously he had been associated also with another Alien Registration number, A29710069. Sassone

---

[2]Diaz conceded that there were sufficient grounds for the police to conduct a Terry stop of the vehicle. See United States v. Diaz, No. CRIM.A.04-10274, 2005 WL 1027437, at *2 (D. Mass. Apr. 29, 2005).

[3]At trial, the parties stipulated that (1) a person named Tony Diaz, also known as Santo Romero, was convicted of a felony for which the punishment exceeded one year in Middlesex Superior Court on April 27, 1998; (2) the person convicted of that felony had a birth date of April 7, 1965; and (3) that the Lawrence police had sufficient grounds to conduct a Terry stop of the vehicle driven by Diaz on July 14, 2004.

explained that the Alien Registration files for the two numbers were consolidated under file number A90567004 in March of 1992, when it was determined that both files documented the same individual. Sassone identified a number of immigration records contained in the consolidated file that were allowed into evidence, including fingerprint cards. The evidence indicated that the alien documented in the file had been deported from the United States to the Dominican Republic in 1992, re-entered in 1993, and was deported again in 2001. Sassone testified that the consolidated alien file had been searched and yielded no evidence of permission to reenter, adjustment of status, or any other authorization to be in the United States. Later that same day, FBI forensics expert Allison Larson testified that the fingerprints on the cards in the alien file discussed by Sassone matched the prints taken from Diaz at the Lawrence police station after his arrest on July 14, 2004.

Defense counsel unsuccessfully objected to the admission of several of the documents in the alien file. Specifically, defense counsel objected to Exhibit 6, a Warning to Alien Ordered Removed or Deported for Santo Rodolfo Romero-Villar, a/k/a Santo R. Romero, a/k/a Jose Rivera Morales, a/k/a Jose Antonio Morales, dated April 10, 1997, on hearsay and relevance grounds. The trial judge allowed the document into evidence on the condition that the government link the names referenced in the document to Diaz. In

-6-

addition, defense counsel objected to Exhibit 10, a Dominican Republic passport issued to Santo Rodolfo Romero Villar, date of birth April 7, 1965, on hearsay and authentication grounds. Finding that the passport had not been formally authenticated, the trial judge refused to allow the document in as an authentic passport, but admitted it as a business record of DHS. Defense counsel also objected to Exhibit 12, a Dominican Republic travel authorization granting the United States permission to deport Santo Romero, date of birth April 7, 1965, to the Dominican Republic, as unauthenticated and hearsay, but the trial judge allowed the document into evidence as a business record of DHS.[4]

---

[4]The following pieces of evidence are also at issue in this appeal: Warrant of Deportation for Santo Rodolfo Romero-Villar, a/k/a Santo Romero, dated March 6, 1992 (Exhibit 4); Warrant of Removal/Deportation for Santo Rodolfo Romero-Villar, a/k/a Santo R. Romero, a/k/a Jose Rivera Morales, a/k/a Jose Antonio Morales, dated April 7, 1997 (Exhibit 5); Immigration Detainer Notice for Santo Romero Villar, dated July 14, 2004 (Exhibit 9); Record of Deportable Alien for Santo Rodolfo Romero Villar, dated April 22, 1991 (Exhibit 11); and Certificate of Nonexistence of Record for Santo Rodolfo Romero-Villar, a/k/a Santo Romero, a/k/a Santo R. Romero, attesting that a search of all computer indices and alien files in relation to A29710069 showed that there was no record of that person seeking permission to reenter the United States after deportation (Exhibit 19).

The government also introduced a Form I-700 Application for Temporary Worker Status for Santo R. Romero dated November 7, 1988, which listed Bani, Dominican Republic, as the applicant's birthplace (Exhibit 20); a fingerprint card under the name Santo Romero submitted in support of the Form I-700 application (Exhibit 21); a Form I-693 Medical Examination of Aliens Seeking Adjustment of Status also submitted in support of the Form I-700 application under the name Santo Romero, with a photo attached and a date of birth of April 7, 1965 (Exhibit 14); and a temporary residency card issued to Santo R. Romero, DOB 4/7/65, birthplace listed as Dominican Republic, with a fingerprint (Exhibit 24).

-7-

The jury found Diaz not guilty on Count I, possession of a firearm by a convicted felon, but guilty on Count II, possession of a firearm and ammunition by an unlawful alien. Based on Diaz's prior convictions,[5] his sentence was enhanced pursuant to ACCA, 18 U.S.C. § 924(e)(1).[6]  This appeal followed.

## II.  Discussion

On appeal, Diaz challenges the district court's denial of his motion to suppress evidence seized from the BMW, the sufficiency of evidence to convict him of being an unlawful alien in possession of a firearm and ammunition, and the enhancement applied to his sentence as a result of previous convictions.

*A. Motion to Suppress*

Our review of the district court's denial of a motion to suppress is plenary.  United States v. Golab, 325 F.3d 63, 66 (1st

_____

All of the above documents were introduced during Sassone's testimony and were contained in alien file A90567004.

[5]The Presentence Report ("PSR") lists at least six separate, drug-related convictions for a Tony Diaz or other known aliases, including Santo Romero.  At the sentencing hearing, the government presented evidence, including photographs and fingerprints, linking the convictions to the Tony Diaz on trial.  Diaz objected that the evidence was insufficient to prove that each of the convictions was attributable to him.

[6]Section 924(e)(1) states, in relevant part:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both. . . such person shall be fined under this title and imprisoned not less than fifteen years . . . .

-8-

Cir. 2003). The district court's conclusions of law are subject to de novo review and we examine its factual findings for clear error. United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006).

"[I]t is well-settled that, based merely on reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected past or present criminal activity." United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996); accord Terry v. United States, 392 U.S. 1, 21 (1968). In Terry, the Supreme Court also held that an officer may pat-down a suspect for weapons when conducting a brief investigatory stop if "he has reason to believe that he is dealing with an armed and dangerous individual . . . ." 392 U.S. at 27; accord United States v. Aitoro, 446 F.3d 246, 252 (1st Cir. 2006).

To determine whether an investigatory stop complies with Terry, we conduct a two-part inquiry. United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005). We first determine whether there was objectively reasonable suspicion to justify the stop at its inception. Id.; see also Golab, 325 F.3d at 66. Here, the stop is not at issue; the parties stipulated that the police had sufficient reason to initiate the Terry stop of the vehicle Diaz was driving on the night in question.

Under the second part of the test, "we ask whether the ensuing search was 'reasonably related in scope to the circumstances which justified the officers' initial interference.'"

Ivery, 427 F.3d at 72 (quoting United States v. Nee, 261 F.3d 79, 83 (1st Cir. 2001)). Traditionally, "frisking" an individual who police have reason to believe is in possession of a weapon is considered "reasonably related in scope" to stopping an individual who is suspected of being involved in past or present criminal activity. See id. However, in recognition of the significant hazards associated with roadside encounters, the Supreme Court has held that police may also "frisk" the passenger compartment of a vehicle for weapons during a roadside Terry stop, if "the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983)(quoting Terry, 392 U.S. at 21). The second prong "imposes a dual requirement for a permissible warrantless search for weapons: (1) the officers must have actually harbored a suspicion that the suspect was armed; and (2) that suspicion must have been reasonable under the circumstances." Ivery, 427 F.3d at 72 (discussing United States v. Lott, 870 F.2d 778, 783-784 (1st Cir. 1989)).

There was ample evidence in this case that the officers actually suspected that Diaz was armed and dangerous and that such suspicion was reasonable in light of the circumstances. Even

-10-

assuming *arguendo* that the district court was correct not to credit Officer Caraballo's testimony that he saw a gun in plain view through the car window before entering the car, the government presented credible evidence indicating that the blue BMW that Diaz was driving matched the description of the vehicle, in make and license plate number, driven by the shooter who fired at the Gonzalez brothers earlier that night.    These 'specific and articulable' facts created a reasonable suspicion under Terry and Long that Diaz had access to a weapon and posed an actual danger to the officers.    Conducting a protective sweep of the passenger compartment for the weapon was therefore permissible, even though Diaz was outside the vehicle and under police control.    See Long, 463 U.S. at 1051-52 (reasoning that a suspect may "break away" from the police or be permitted to reenter the vehicle and then would have access to any weapons inside); see also Flowers v. Fiore, 359 F.3d 24, 30-31 (1st Cir. 2004)(finding no constitutional violation where police handcuffed driver and then performed protective sweep of his car during Terry stop, because officers had reasonable suspicion that driver was armed and dangerous); United States v. Taylor, 162 F.3d 12, 20-21 (1st Cir. 1998)("[T]he officers were permitted to conduct a search of the passenger compartment of the automobile for any weapons that might have been accessible to the occupants.    This limited search of the vehicle for weapons was

permitted even though the occupants had been secured and taken to the rear of [the car].").

Though Diaz concedes that Long authorizes police officers to conduct a protective sweep of the passenger compartment of a vehicle during a roadside Terry stop, he attempts to distinguish his situation from Long. Diaz argues that he was handcuffed and thus no longer a danger to police when his car was searched. He discusses Thornton v. United States, 541 U.S. 615 (2004), in which the Supreme Court found that a search of a suspect's vehicle after the suspect was arrested, handcuffed, and placed in the back of a patrol car was a permissible search incident to arrest. Id. at 622-23. Because Diaz was not formally arrested at the time police searched his vehicle, he contends that Thornton does not apply and that the search was therefore impermissible.

We refuse to pursue the red herring of Thornton dangled by Diaz. The Supreme Court's opinion in Thornton, regarding the lawfulness of vehicular searches incident to arrest, does nothing to abrogate the limited vehicular "frisk" permitted during a Terry stop by Long and its progeny.[7] Indeed, the majority's reasoning in

---

[7]Furthermore, the Supreme Court's opinion in Thornton was carefully limited to the question whether police may search a suspect's vehicle incident to arrest when an officer's first contact with the suspect occurs after the suspect has exited the vehicle.  541 U.S. at 617.  The Supreme Court recently granted certiorari in a case where petitioners seek an answer to the question more pertinent to the argument Diaz is attempting to make here--that is, whether a warrantless search incident to arrest is permissible when there is no demonstrable threat to officer safety

Thornton only strengthens the rationale for the type of search conducted in this case. If officer safety concerns justify the search of a vehicle's passenger compartment where the vehicle's occupant had exited the vehicle before being confronted by police and was arrested, handcuffed, and secured in the backseat of a police car, surely safety concerns justify the same search where the vehicle's occupant was only temporarily detained under Terry and may imminently regain control of the vehicle and its contents. Thus, the district court properly denied Diaz's motion to suppress the firearm and ammunition found in the vehicle.

B.  Sufficiency of the Evidence

Diaz argues on appeal that the government failed to prove that he was (1) an alien (2) unlawfully present in the United States and (3) in possession of a firearm. Ordinarily, we would

or need to preserve evidence.  Arizona v. Gant, ___ S. Ct. ___, 2008 WL 482034 (Feb. 25, 2008).  Neither Thornton nor the Court's forthcoming opinion in Gant can control in this instance, however, where the disputed search was conducted incident to a Terry stop by officers who had reason to believe Diaz was armed and dangerous. Diaz suggests that the concurring and dissenting opinions in Thornton call into question the officer safety rationale for permitting a search of a passenger compartment when police have secured the occupant in handcuffs outside the vehicle.  Even if this were correct (and we take no position on that point), we reiterate that Thornton does not control here; Long does.  We are mindful of the Supreme Court's admonition that, "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997)(internal quotations omitted).

-13-

review this sufficiency of the evidence claim by determining whether a rational factfinder could have found each of those elements of the crime proven beyond a reasonable doubt. <u>United States</u> v. <u>Garcia</u>, 452 F.3d 36, 43 (1st Cir. 2006). But because Diaz did not ask the district court for a judgment of acquittal on the count for which he was eventually convicted, we review only for plain error and "reverse only if the conviction would result in a 'clear and gross injustice.'" <u>United States</u> v. <u>Pratt</u>, 496 F.3d 124, 127 (1st Cir. 2007)(quoting <u>United States</u> v. <u>Bello-Perez</u>, 977 F.2d 664, 668 (1st Cir. 1992)).[8]

As a preliminary matter, Diaz argues that two documents offered by the government to prove alienage--the Dominican Republic passport and travel document--were erroneously admitted into evidence; he contends that neither was properly authenticated or

---

[8]At the conclusion of the government's case-in-chief, Diaz moved for judgment of acquittal on Count I of the indictment only. In fact, as to the first two elements of Count II, the count for which he was convicted and which he now seeks to overturn on appeal, Diaz may well have not only failed to preserve a challenge to the sufficiency of the evidence, but waived it entirely. During his closing argument, defense counsel proclaimed to the jury, "[i]s there any question in your mind. . . that this man right here is an illegal alien? They've proven that beyond a reasonable doubt," and later reiterated, "[t]hey've proven beyond a reasonable doubt that [Diaz is] an illegal alien." <u>See</u> <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 733 (1993) (describing waiver as the "intentional relinquishment or abandonment of a known right" (internal quotations omitted)); <u>United States</u> v. <u>Jimenez</u>, 512 F.3d 1, 7 (1st Cir. 2007)("A waiver is unlike a forfeiture, for the consequence of a waiver is that the objection in question is unreviewable."). Nonetheless, we will assume for the sake of argument that all of Diaz's sufficiency of the evidence claims merit a plain error review.

fully translated from Spanish into English.[9]  Because we believe
that a determination that Diaz is an alien would not be plainly
erroneous even if those two documents were excluded from
consideration, resolving Diaz's objections as to the admissibility
of those documents is not critical to our discussion of Diaz's
sufficiency claims.  Nevertheless, we will review the district
court's decision to admit the documents for abuse of discretion.
United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994).

        The Federal Rules of Evidence require, "as a condition
precedent to admissibility[,]. . . evidence sufficient to support
a finding that the matter in question is what its proponent
claims."  Fed. R. Evid. 901(a).  The district court admitted the
documents as business records of DHS, for the very limited purpose
of showing "that [DHS] deported a man to the Dominican Republic
whose name was Santo Romero and had that picture," i.e., to connect
Diaz to his alias and prior removal from the country.  See United
States v. Pluta, 176 F.3d 43, 50 (2d Cir. 1999).  We see no abuse
of discretion on the part of the court in admitting the documents
for that limited purpose, given that both of the challenged
documents included Diaz's photo, the passport also included his

_____

        [9]At trial, Diaz also appeared to put forward a hearsay
objection, which is mentioned in his brief on appeal but not
argued.  Accordingly, we consider it waived and do not address it.
See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)
("[I]ssues adverted to in a perfunctory manner, unaccompanied by
some effort at developed argumentation, are deemed waived.").

date of birth, and both were produced by DHS officials and came from the Alien Registration file associated with Diaz's known aliases. Under those circumstances, the trial court permissibly found that there was "sufficient evidence to allow a reasonable person to believe the evidence is what it purports to be." Garcia, 452 F.3d at 40.

While Diaz objected to the documents at trial on authenticity grounds, he did not specifically raise an objection to the lack of an English translation.[10]  We therefore review the district court's decision to admit the documents without translation for plain error only. United States v. Morales-Madera, 352 F.3d 1, 10 (1st Cir. 2003). As we have said before, "[i]t is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English . . . . [P]arties are required to translate all foreign documents into English." United States v. Rivera-Rosario, 300 F.3d 1, 5, 7 n.4 (1st Cir. 2002). The submission of foreign language documents unaccompanied by English translations is error and in ordinary circumstances would bar those documents from consideration by the court. See United States v. Contreras Palacios, 492 F.3d 39, 43 n.7 (1st Cir. 2007). Here, however, the documents were admitted for a limited purpose,

---

[10]Diaz did not request translations of the passport or travel document at trial, but the district judge noted with concern that the documents were untranslated, and the government correctly concedes that it was "remiss" in not providing translations.

and their evidentiary significance was facially apparent in that it comprised Diaz's photo (on both documents), the use of his alias (on both documents) and his signature and birth date (on the passport). Cf. id. Thus it cannot be said that a "miscarriage of justice" resulted from the district court's decision to admit the documents without translation. Morales-Madera, 352 F.3d at 10.

1. Alien

In addition to the admissibility issues discussed above, Diaz advances several objections to the evidence submitted by the government to prove his alienage. He takes issue with the government's reliance on warrants and orders of removal and deportation, which he argues do not prove alienage beyond a reasonable doubt because of the different burden of proof applicable to civil deportation proceedings. Diaz also claims that the entry into evidence of the purportedly unauthenticated and untranslated Dominican Republic passport and travel document, and of the deportation/removal orders without any limiting instructions, in tandem with the government's heavy emphasis on those documents in its opening and closing statements, denied him a fair trial and due process of law in violation of the Fifth and Sixth Amendments.

We find the totality of the evidence sufficient to permit a rational jury to find Diaz to be an alien beyond a reasonable doubt, let alone meet the lower bar posed by plain error review.

See  United  States  v.  Martin,  228  F.3d  1,  10  (1st  Cir.
2000)("[J]uries need not evaluate pieces of evidence in isolation,
but  may  draw  conclusions  from  the  sum  of  an  evidentiary
presentation."). The government presented, inter alia, fingerprint
and photographic evidence linking Diaz to his various aliases and
to a DHS Alien Registration file showing that he had been ordered
removed  from  the  country  twice  before.    That  the  warrants  and
orders of deportation/removal stem from civil rather than criminal
proceedings is not fatal to their inclusion into the total calculus
of  evidence  here,  where  other  evidence  strongly  supports  the
inference of alienage.  See, e.g., Contreras Palacios, 492 F.3d at
43-44 (evidence, which included warrant of deportation, sufficient
to prove defendant was an alien).

Because Diaz failed to raise his constitutional arguments
at trial, we review his Fifth and Sixth Amendment claims for plain
error only.  United States v. Henderson, 320 F.3d 92, 102 (1st Cir.
2003).  As noted above, the Dominican Republic passport and travel
document were admissible for the limited purpose delineated by the
district court.   If the government unreasonably harped on these
documents in its opening and closing statements--an objection which
again, Diaz did not raise at trial--doing so nevertheless did not
result in a "clear and gross injustice."  See id. at 105 ("Where,
as  here,  the  defendant  made  no  objection  to  the  government's
closing argument at trial, the standard of review is plain error .

. . . [Defendant] faces a high hurdle because it is established that plain error review is ordinarily limited to blockbusters . . . ." (internal quotations omitted)). Diaz cannot clear this hurdle, especially considering defense counsel's repeated assertions during his own closing argument that the government had adduced sufficient evidence to prove beyond a reasonable doubt that Diaz was an illegal alien. Finally, at trial Diaz never requested a limiting instruction with regard to the warrants and orders of deportation/removal, and thus "he is not entitled to argue here that the district court's failure to provide a limiting instruction constitutes reversible error." United States v. Walter, 434 F.3d 30, 35 (1st Cir. 2006).

2. Unlawfully present

Diaz asserts that the government did not sufficiently prove he was unlawfully present in the United States because it did not check both of the Alien Registration numbers associated with his aliases and did not produce a Certificate of Nonexistence of Record for the name "Tony Diaz." However, as discussed above, the government provided the jury with a veritable cornucopia of evidence from DHS, on the basis of which it was clearly not plain error for the jury to conclude that the Tony Diaz on trial and the Santo Rodolfo Romero-Villar, a/k/a Santo Romero, a/k/a Santo R. Romero, named on the Certificate of Nonexistence of Record entered into evidence were the same person. This court has held that such

-19-

a certificate can be used to establish unlawful presence in the United States.  See Scantleberry-Frank, 158 F.3d at 616 n.1. Furthermore, Sassone adequately explained why only one Alien Registration number was checked, when she testified that the government ran one number because as of 1992 the two numbers had been consolidated into one file.

    3.  Possession of the firearm and ammunition

To sustain a conviction under 18 U.S.C. § 922(g)(5)(A), the government must present at trial sufficient evidence to prove beyond a reasonable doubt that the defendant knowingly possessed a firearm and ammunition in or affecting interstate commerce.  Diaz does not quibble with the interstate commerce portion of the charge, but does contend that the government did not sufficiently prove possession.  Knowing possession of a firearm may be "either actual or constructive."  United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992).  "In order to show constructive possession, the government must prove that the defendant 'had dominion and control over the area where the contraband was found.'"  Id. (quoting United States v. Barnes, 890 F.2d 545, 549 (1st Cir. 1989)).

We find that the government proffered sufficient evidence to meet its burden.  The jury heard evidence that the loaded firearm was discovered under the passenger seat, within the lunge area of the driver's seat, in the car Diaz was driving moments

after police ordered Diaz to exit the vehicle, and that Diaz was the only occupant of the vehicle. The jury also heard Detective Burokas and Officer Ayala, the Spanish-speaking police officer who Mirandized Diaz, testify that during booking Diaz stated he had bought the gun on the street for $300.

Diaz, on the other hand, argues that there was no evidence that he owned the car in which the gun was found and that his fingerprints were not on the gun, ammunition, or clip. In addition, he attempts to cast aspersions on the testimony of Detective Burokas and Officer Ayala, merely because they did not video or audio-tape Diaz's statement regarding his purchase of the gun. We are mindful, however, that as the reviewing court "we may neither evaluate the credibility of the witnesses nor weigh the relative merit of theories of innocence postulated by the defendant." United States v. Maldonado-Garcia, 446 F.3d 227, 231 (1st Cir. 2006)(citing United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998)). Rather, we are tasked with upholding "any verdict that is supported by a plausible rendition of the record." United States v. Liranzo, 385 F.3d 66, 69 (1st Cir. 2004)(internal quotations omitted). Even under the more permissive standard for a preserved sufficiency challenge, to say nothing of the plain error standard that applies in this case, there was sufficient evidence for the jury to find, beyond a reasonable doubt, that Diaz possessed the firearm and ammunition.

-21-

*C. Sentencing Enhancement*

Diaz also protests the ACCA sentencing enhancement applied by the district court, arguing that his Sixth Amendment rights were violated because the enhancement was based on prior convictions that were never presented to the jury and proved beyond a reasonable doubt. Constitutional challenges to ACCA enhancements are subject to de novo review. See United States v. Duval, 496 F.3d 64, 80 (1st Cir. 2007).

We hold, as we have held before, that this argument is foreclosed by Almendarez-Torres v. United States, 523 U.S. 224, 226-27 (1998)(holding that fact of prior conviction for sentencing purposes need not be proved to jury beyond reasonable doubt). See United States v. Earle 488 F.3d 537, 549 (1st Cir. 2007); Ivery, 427 F.3d at 74-75. Diaz notes that Justice Thomas, in a recent concurrence, cast doubts on the continuing viability of Almendarez-Torres. See Shepard v. United States, 544 U.S. 13, 27-28 (2005)(Thomas, J., concurring). Diaz relies on a line of Supreme Court cases from Apprendi v. New Jersey, 530 U.S. 466 (2000), to Blakely v. Washington, 542 U.S. 296 (2004), through Shepard and United States v. Booker, 543 U.S. 220 (2005), to buttress his argument. This court has rejected nearly identical arguments in the past, however, observing that "[t]he Shepard majority noted the possibility that Apprendi may eventually be extended to require proof of prior convictions to a jury, but cautioned that this 'is

up to the future to show.' . . . [B]oth Blakely and Booker recognized the continued viability of the Almendarez-Torres exception." Ivery, 427 F.3d at 75 (quoting Shepard, 544 U.S. at 26 n. 5). Unless and until a majority of the Supreme Court decides otherwise, Almendarez-Torres continues to be binding precedent upon this court. See Earle, 488 F.3d at 549 (affirming that we remain bound by Almendarez-Torres).

Diaz lobs one final argument into the mix, contending that because he was acquitted of the felon-in-possession charge, that prior felony conviction cannot be used as the basis for an upward adjustment of his base offense level, nor for the ACCA sentencing enhancement.[11] We give "due deference" to a district court's findings of fact at sentencing, and will reverse only for clear error. United States v. Woodward, 277 F.3d 87, 91 (1st Cir. 2002).

Here, Diaz does what he earlier accused the prosecution of doing, and confounds different findings arrived at during different proceedings with different burdens of proof. Diaz argues that the jury "necessarily found by its verdict that [he] was not a felon under the conviction presented to them." That is not correct. The acquittal on the felon-in-possession charge means

---

[11]Diaz describes the conviction in question as "the case listed on page 9 of the [PSR]." That case is the April 27, 1998, conviction of one Tony Diaz, also known as Santo Romero, on drug felony charges in Middlesex Superior Court.

-23-

merely that the jury could not agree that the government had proved
that charge beyond a reasonable doubt.    A sentencing judge,
however, need only find prior convictions by a preponderance of the
evidence.  See id. ("The government has the burden of proving the
facts central to upward adjustments in offense levels by
preponderance of the evidence, not by proof beyond a reasonable
doubt.")(citing United States v. Aymelek, 926 F.2d 64, 67 (1st Cir.
1991)).  On that basis, we see no clear error here: as the judge
below ruled, a preponderance of the evidence adduced at sentencing
supports the conclusion that Diaz and the Tony Diaz/Santo Romero
convicted in April 1998 on drug trafficking charges are the same
person.    The conviction thus serves as a proper basis for the
sentencing enhancements, regardless of the jury verdict.[12]

## III.  Conclusion

For the reasons stated above, the defendant's conviction
and sentence are AFFIRMED.

---

[12]It should be noted that Diaz would likely qualify for the
ACCA enhancement even if the disputed April 1998 conviction were
not considered.  ACCA requires only "three previous convictions
. . . for a violent felony or a serious drug offense, or both,
committed on occasions different from one another."  18 U.S.C. §
924(e)(1).  At the sentencing hearing, the judge made a finding
attributing only three of the six separate convictions listed in
the PSR to Diaz, saying, "I'm not even making an effort to go
through the other [convictions]."  A preponderance of the evidence
in the record as we read it, however, suggests that at least one,
if not all, of the other three convictions, each of which qualifies
as a separate ACCA predicate offense, could also be attributed to
Diaz.